# 16-2070(L), 16-259(XAP)

# United States Court of Appeals

*for the*

# Second Circuit

E.J. BROOKS COMPANY, dba TYDENBROOKS,

*Plaintiff-Counter-Defendant-Appellant-Cross-Appellee,*

– v. –

CAMBRIDGE SECURITY SEALS, BRIAN LYLE, MICHAEL GIZZARELLI, GURMEET SINGH GROVER,

*Defendants-Counter-Claimants-Appellees-Cross-Appellants,*

JACK WALLIN, JUSTIN HAYES, FERNANDO DaROSA, RICHARD WEIGAND, JOHANNA BRIDGES, JILL NILSSON,

*Defendants-Counter-Claimants-Appellees,*

CAMBRIDGE RESOURCES, CODA RESOURCES, LTD., dba CAMBRIDGE RESOURCES,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR
## DEFENDANTS-APPELLEES-CROSS-APPELLANTS

DANIEL J. FETTERMAN
HOWARD SCHUB
KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
*Attorneys for Defendants-Appellees-
Cross-Appellants*
1633 Broadway
New York, New York 10019
(212) 506-1700

## **<u>CORPORATE DISCLOSURE STATEMENT</u>**

There are no publicly held corporations that own more than 10% of the stock of Defendant-Cross Appellant Cambridge Security Seals.

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................... iii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES.............................................................1

STATEMENT OF THE CASE................................................................2

STATEMENT OF FACTS ......................................................................5

      A.     TydenBrooks Consolidates Domestic Security Seals Manufacturers..................................................................5

      B.     TydenBrooks Files Lawsuit Against CSS to "Slow Them Down"......................................................................6

      C.     The District Court Precludes CSS's Critical Evidence Before and During Trial ..................................................9

SUMMARY OF ARGUMENT ..............................................................11

ARGUMENT ........................................................................................12

I.     Standard ......................................................................................12

II.    The District Court Committed Reversible Error by Giving Erroneous Damages Charges to the Jury ......................................................12

      A.     The District Court Erred by Instructing the Jury That TydenBrooks Could Recover as Damages Hypothetical Avoided Development Costs.............................................13

      B.     The District Court Erred by Not Instructing the Jury on the Requirement That TydenBrooks Must Have Sustained an Injury in Fact as a Result of CSS's Alleged Misconduct ..............................21

III.   The District Court Erred by Granting Judgment to TydenBrooks to Recover the Same Damages Three Times on Three Alternative Claims Seeking the Same Relief..................................................................30

IV.  CSS Was Denied a Fair Trial Because of the District Court's
     Improper Preclusion of Evidence in Support of CSS's Defense Theory ......36

     A.    The District Court Abused Its Discretion by Excluding
           Evidence That TydenBrooks's Manufacturing Process Was Not
           Valuable ...........................................................................................40

           1.   TydenBrooks's Internal Financial Documents ........................41

           2.   George Lundberg's Testimony ..................................................44

           3.   "Exact Same" Manufacturing Process Documents ..................49

           4.   "Tiger Team" Emails ................................................................51

           5.   Cross-Examination on Damages ...............................................55

     B.    The District Court Abused Its Discretion by Excluding
           Evidence That TydenBrooks's Manufacturing Process Was Not
           a Secret .............................................................................................57

           1.   Third-Party Security Seals .......................................................58

           2.   Robert Baker's Testimony .......................................................63

     C.    The District Court Abused Its Discretion by Excluding
           Evidence Reflecting TydenBrooks's Malice Toward CSS as a
           Competitor ........................................................................................66

V.   CSS's Antitrust Counterclaim Should Be Reinstated ...................................73

CONCLUSION ........................................................................................................75

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.F.A. Tours, Inc. v. Whitchurch*,
   937 F.2d 82 (2d Cir. 1991) ...............................................................13

*American Safety Table Co. v. Schreiber*,
   415 F.2d 373 (2d Cir. 1969) .......................................................13, 26

*Andrews v. Metro N. C. R. Co.*,
   882 F.2d 705 (2d Cir. 1989) ...........................................................43

*Arlio v. Lively*,
   474 F.3d 46 (2d Cir. 2007) .............................................................39

*Avery Dennison Corp. v. Four Pillars Enter. Co.*,
   45 F. App'x 479 (6th Cir. 2002) ......................................................19

*B & G Plastics*,
   2004 WL 307276 (S.D.N.Y. Feb. 18, 2004) ...............................46, 64

*Bender v. City of N.Y.*,
   78 F.3d 787 (2d Cir. 1996) .............................................................30

*Bourns, Inc. v. Raychem Corp.*,
   331 F.3d 704 (9th Cir. 2003) ..........................................................19

*Branum v. Clark*,
   927 F.2d 698 (2d Cir. 1991) ...........................................................12

*Chin v. Port Auth. of N.Y. & N.J.*,
   685 F.3d 135 (2d Cir. 2012) ...........................................................43

*Conway v. Icahn & Co.*,
   16 F.3d 504 (2d Cir. 1994) ..................................................32, 34, 35

*In re Cross Media Marketing Corp.*,
   2006 WL 2337177 (S.D.N.Y. Aug. 11, 2006).......................17, 18, 27

*Cruz v. Local Union No. 3 of Int'l Bd. of Elec. Workers*,
   34 F.3d 1148 (2d Cir. 1994) ...........................................................29

*Daubert v. Merrell Dow Pharms.*,
    509 U.S. 579 (1993)..........................................................................56

*David v. Alaska*,
    415 U.S. 308 (1974)..........................................................................68

*Diversified Graphics Ltd. v. Groves*,
    868 F.2d 293 (8th Cir. 1989) ..........................................................30

*Doctor's Associates, Inc. v. Weible*,
    92 F.3d 108 (2d Cir. 1996) ..............................................................29

*Earl v. Bouchard Transp. Co.*,
    917 F.2d 1320 (2d Cir. 1990) ..........................................................36

*Electro-Miniatures v. Wendon*,
    771 F.2d 23 (2d Cir. 1985) ..............................................................26

*Electrolux Corp. v. Val-Worth, Inc.*,
    6 N.Y.2d 556 (N.Y. 1959) ....................................................13, 21, 25

*Elyse v. Bridgeside Inc.*,
    367 F. App'x 266 (2d Cir. 2010) ......................................................36

*Florczak v. Oberriter*,
    50 A.D.3d 1440 (3d Dep't 2008).......................................................25

*Gentile v. County of Suffolk*,
    926 F.2d 142 (2d Cir. 1991) .............................................................35

*George W. Luft Co. v. Zande Cosmetic Co.*,
    142 F.2d 536 (2d Cir. 1944) .............................................................26

*Girden v. Sandals Int'l*,
    262 F.3d 195 (2d Cir. 2001) .............................................................12

*Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*,
    8 F. Supp. 3d 467, 483 (S.D.N.Y. 2014) ..........................................21

*Hudson Hotels Corp. v. Choice Hotels Int'l*,
    995 F.2d 1173 (2d Cir. 1993) ...........................................................58

iv

*Hughes v. Patrolmen's Benevolent Ass'n of the City of N.Y., Inc.*,
850 F.2d 876 (2d Cir. 1988), *cert. den.* 488 U.S. 967 (1988) ............................30

*Imperial Chem. Indus. Ltd. v. National Distillers & Chem. Corp.*,
342 F.2d 737 (2d Cir. 1965) ................................................................57

*Indu Craft, Inc. v. Bank of Baroda*,
47 F.3d 490 (2d Cir. 1995) ................................................................32

*International Indus., Inc. v. Warren Petroleum Corp.*,
248 F.2d 696 (3d Cir. 1957) ................................................................19

*Julie Research Labs., Inc. v. Select Photographic Eng'g, Inc.*,
998 F.2d 65 (2d Cir. 1993) ............................................................57, 59

*Kotteakos v. United States*,
328 U.S. 750 (1946)................................................................37

*Lightfoot v. Union Carbide Corp.*,
110 F.3d 898 (2d Cir. 1997) ............................................................47, 64

*LinkCo, Inc. v. Fujitsu Ltd.*,
230 F. Supp. 2d 492 (S.D.N.Y. 2002) ....................................15, 16, 17, 21

*LinkCo, Inc. v. Fujitsu Ltd.*,
232 F. Supp. 2d 182 (S.D.N.Y. 2002) ....................................15, 16, 18

*MacDermid Printing Sols., LLC v. Cortron Corp.*,
08 Civ. 1649, 2015 WL 251527 (D. Conn. Jan. 20, 2015)................................31

*Malek v. Fed. Ins. Co.*,
994 F.2d 49 (2d Cir. 1993) ............................................................37, 39

*Matarese v. Moore-McCormack Lines*,
158 F.2d 631 (2d Cir. 1946) ................................................................17

*Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.*,
290 F.3d 98 (2d Cir. 2002) ............................................................46, 64

*Michel Cosmetics v. Tsirkas*,
282 N.Y. 195 (1940)................................................................23, 24

*Miller v. Schloss*,
218 N.Y. 400 (N.Y. 1916) ...................................................................22

*In re Mud King Prods., Inc.*,
13-BR-32101, 2015 WL 862319 (S.D. Tex. Feb. 27, 2015) ....................... 18-19

*In re Mud King Prods., Inc.*,
514 B.R. 496 (Bankr. S.D. Tex. 2014) ...........................................18

*Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*,
596 F.3d 112 (2d Cir. 2010) ............................................................12

*Old Chief v. U.S.*,
519 U.S. 172 (1997)........................................................................39

*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*
508 U.S. 49 (1993)..........................................................................67

*Racich v. Celotex Corp.*,
887 F.2d 393 (2d Cir. 1989) ............................................................13

*Rivas v. Brattesani*,
94 F.3d 802 (2d Cir. 1996) ..............................................................36

*Ronson Metal Art Works v. Gibson Lighter Co.*,
3 A.D.2d 227 (1st Dep't 1957) ........................................................25

*Rosenfeld v. Basquiat*,
78 F.3d 84 (2d Cir. 1996) ................................................................39

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984)..................................................................*passim*

*Salem v. United States Lines Co.*,
370 U.S. 31 (1962)..........................................................................43

*SEC v. Jasper*,
678 F.3d 1116 (9th Cir. 2012) .........................................................43

*Securitron Magnalock Corp. v. Schnabolk*,
65 F.3d 256 (2d Cir. 1995) ........................................................46, 64

*Snyder v. Wells Fargo Bank, N.A.*,
  594 F. App'x 710 (2d Cir. 2014) ...................................................................43

*Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*,
  118 F.3d 955 (2d Cir. 1997) .......................................................................16

*Speedry Chem. Prods., Inc. v. Carter's Ink Co.*,
  306 F.2d 328 (2d Cir. 1962) .......................................................................57

*Sperry Rand Corp. v. A-T-O, Inc.*,
  447 F.2d 1387 (4th Cir. 1971) ...................................................................18

*Straus v. Notaseme Hosiery Co.*,
  240 U.S. 179 (1916)....................................................................................23

*Teen-Ed, Inc. v. Kimball Int'l, Inc.*,
  620 F.2d 399 (3d Cir. 1980) .......................................................................47

*Telex Corp. v. IBM Corp.*,
  510 F.2d 894 (10th Cir. 1975) ..............................................................19, 25

*Thermodyne Food Serv. Products, Inc. v. McDonald's Corp.*,
  940 F. Supp. 1300 (N.D. Ill. 1996)............................................................64

*Tingley Sys., Inc. v. Norse Sys., Inc.*,
  49 F.3d 93 (2d Cir. 1995) ...........................................................................35

*In re U. S. Fin. Sec. Litig.*,
  609 F.2d 411 (9th Cir. 1979) ......................................................................44

*U.S. Indus., Inc. v. Touche Ross & Co.*,
  854 F.2d 1223 (10th Cir. 1988) ..................................................................35

*U.S. v. Abel*,
  469 U.S. 45 (1984)................................................................................68, 69

*U.S. v. Curley*,
  639 F.3d 50 (2d Cir. 2011) .........................................................................62

*U.S. v. Cuti*,
  720 F.3d 453 (2d Cir. 2013) ..................................................................47, 65

*U.S. v. Gelzer*,
50 F.3d 1133 (2d Cir. 2000) ...............................................................37

*U.S. v. Ghavami*,
23 F. Supp. 3d 148, 171-72 (S.D.N.Y. May 15, 2014) ................................47, 65

*U.S. v. Santiago*,
560 F.3d 62 (1st Cir. 2009).................................................................47

*U.S. v. Southland Corp.*,
760 F.2d 1366 (2d Cir. 1985) ..............................................................37

*U.S. v. Yannotti*,
541 F.3d 112 (2d Cir. 2008) ...................................................... 46-47, 65

*United States v. Rigas*,
490 F.3d 208 (2d Cir. 2007) ..................................................43, 46, 64

*University Computing Co. v. Lykes-Youngstown Corp.*,
504 F.2d 518 (5th Cir. 1974) ...........................................................18, 24

*Vermont MicroSystems, Inc. v. Autodesk, Inc.*,
138 F.3d 449 (2d Cir. 1998) ............................................................12, 16

*Vermont MicroSystems, Inc. v. Autodesk, Inc.*,
88 F.3d 142 (2d Cir. 1996) ................................................................15

*Welch v. United Parcel Serv., Inc.*,
871 F. Supp. 2d 164 (E.D.N.Y. 2012) ...................................................29

*Wellogix, Inc. v. Accenture, LLP*,
716 F.3d 867 (5th Cir. 2013) .........................................................19, 25

*Wickham Contracting Co. v. Board of Educ. of City of N.Y.*,
715 F.2d 21 (2d Cir. 1983) ..........................................................30, 33

*Wiseman v. Sinclair Ref. Co.*,
290 F.2d 818 (2d Cir. 1961) ...............................................................56

**Statutes**

15 U.S.C. § 2 ..............................................................................74

28 U.S.C. § 1291 ............................................................................1

28 U.S.C. §§ 1331 ........................................................................1

28 U.S.C. § 1338(a) .....................................................................1

28 U.S.C. § 1367...........................................................................1

**Other Authorities**

Federal Rule of Civil Procedure 50 ...........................................5

Federal Rule of Civil Procedure 59 ...........................................5

Federal Rule of Evidence 403................................................53, 71

Restatement (Third) of Unfair Competition § 45, cmt. ............19

## JURISDICTIONAL STATEMENT

Plaintiff-Cross Appellee E.J. Brooks Company d/b/a TydenBrooks ("TydenBrooks") filed its complaint against Defendant-Cross Appellant Cambridge Security Seals ("CSS") and certain other parties in the United States District Court for the Southern District of New York (the "District Court"). CSS filed its counterclaims against TydenBrooks in the District Court. The District Court had subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a), and supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Trial by jury commenced on April 20, 2015 and concluded on May 4, 2015. On May 4, 2015, the jury rendered a verdict in favor of TydenBrooks in the amount of $3.9 million. Judgment was entered against CSS in the amount of $3.9 million on May 13, 2015. CSS timely filed a motion to vacate or modify the Judgment, which the District Court denied on December 28, 2015. (SPA.30-67.)[1] CSS timely filed a Notice of Cross-Appeal on January 25, 2016. (A.1037-39.) This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the District Court erred by instructing the jury that it could measure damages based on avoided development costs where such a speculative

_____

[1] References to the Special Appendix for Defendants-Appellees-Cross-Appellants submitted herewith shall be "SPA._" and references to the Joint Appendix shall be "A._".

measure of damages has not been recognized under New York law and where other, non-speculative damages were measurable and available.

2. Whether the District Court erred by instructing the jury that it could rule for TydenBrooks without satisfying the requirements of injury and causation.

3. Whether the District Court erred by allowing the jury to award the same amount of damages three times on three alternative claims seeking the same relief.

4. Whether the District Court deprived CSS of a fair trial by repeatedly excluding highly relevant and probative evidence that would have proven there was no misappropriation of trade secrets or confidential information and that TydenBrooks suffered no damages.

## STATEMENT OF THE CASE

This action arises out of TydenBrooks's claim that CSS had misappropriated its alleged secret automated process for manufacturing plastic security seals. Plastic security seals are mechanisms attached to equipment, trucks, or containers which, if broken, provide evidence of tampering. Plastic security seals are relatively simple products to produce in today's world, and there are numerous manufacturers that produce seals that are similar to the seals that TydenBrooks makes and even more plastics manufacturers who use fully automated manufacturing processes.

TydenBrooks is an amalgamation of five of the largest seal manufacturers in North America, and the largest manufacturer of plastic security seals in the United States. CSS was founded in 2010, and began manufacturing plastic security seals at the end of 2011. CSS's security seals are manufactured locally, and CSS was able to offer its customers higher quality seals, at cheaper prices, with faster delivery times, and better customer service than TydenBrooks.

In early 2012, TydenBrooks acknowledged that it could not compete with CSS's quality, prices, lead times, or service, and that CSS was a threat to its business. Unable to respond competitively, TydenBrooks decided to file a lawsuit against CSS and certain former TydenBrooks employees working for CSS in order to disrupt its business. On April 12, 2012, TydenBrooks commenced this lawsuit. CSS filed counterclaims against TydenBrooks for bringing a sham lawsuit against CSS in violation of antitrust laws. Prior to trial, TydenBrooks dismissed with prejudice all but four of its claims. It also filed multiple motions *in limine* seeking to exclude evidence that undermined its remaining claims.

On March 5, 2015, the District Court granted TydenBrooks's motion *in limine* to exclude evidence of TydenBrooks's subjective intent in bringing the lawsuit against CSS. On March 11, 2015, the District Court granted TydenBrooks's motion *in limine* to exclude certain testimony given by TydenBrooks's former Vice President of Operations, Robert J. Baker, that

TydenBrooks's manufacturing process was very simple and that he did not consider it to be secret. On March 18, 2015, the District Court granted TydenBrooks's motions *in limine* to exclude certain evidence concerning TydenBrooks's struggles to compete with CSS in the marketplace as a result of reductions in force and offshoring. On April 15, 2015, the District Court granted TydenBrooks's motion *in limine* to exclude evidence of security seals manufactured by third-party manufacturers. On April 17, 2015, the District Court sustained multiple objections made by TydenBrooks to the admissibility of certain evidence reflecting TydenBrooks's subjective intent to bring the lawsuit as a pretext to disrupt and slow down CSS's business while TydenBrooks worked to fix its own manufacturing and distribution problems.

During trial, the District Court precluded CSS from eliciting testimony from TydenBrooks's former product design manager, George Lundberg, that TydenBrooks's manufacturing processes were not secret or unique. The District Court precluded CSS from introducing TydenBrooks's financial statements, a valuation of its assets, and the testimony of a valuation consultant, all of which prove that TydenBrooks attributed no value to any of its manufacturing processes as trade secrets. The District Court also dismissed CSS's counterclaims. On May 4, 2015, the jury rendered a verdict in favor of TydenBrooks in the amount of $3.9 million, awarding $1.3 million to TydenBrooks for three of TydenBrooks's four

4

claims: misappropriation of trade secrets, unfair competition, and unjust enrichment. The judgment was entered on May 13, 2015 (the "Judgment"), in the amount of $3.9 million. CSS filed a motion to vacate or modify the Judgment, which was denied by the Post-Judgment Order.

CSS appeals from the Judgment, the Memorandum and Order entered on December 28, 2015 denying CSS's motion for judgment as a matter of law or a new trial pursuant to Federal Rules of Civil Procedure 50 and 59 or, in the alternative, to alter or amend the Judgment pursuant to Rule 59. CSS also appeals the multiple pre-trial orders on TydenBrooks's motions *in limine* that excluded from trial critical evidence, including evidence of (i) TydenBrooks's admissions that it has no valuable manufacturing trade secrets, (ii) security seals made by third parties that are identical to those manufactured by TydenBrooks and CSS, (iii) TydenBrooks's efforts to remediate its poor manufacturing processes, and (iv) internal TydenBrooks documents showing that the lawsuit was a pretext to slow down fair competition from CSS.

## STATEMENT OF FACTS

### A.  TydenBrooks Consolidates Domestic Security Seals Manufacturers

TydenBrooks was formed through the private-equity fueled consolidation of five of the largest seal manufacturers in North America, and is the largest manufacturer of plastic security seals in the U.S. (A.435.) After completing a

series of acquisitions and mergers between 2005 and 2010 (including E.J. Brooks Company ("EJBrooks") in 2009, and Stoffel Seals ("Stoffel") in 2010), TydenBrooks began implementing an integration plan that was premised upon reducing headcount and closing domestic manufacturing plants and opening new manufacturing facilities in China and Mexico. (A.434.) However, as a direct result of poor implementation of its integration plan, TydenBrooks began experiencing significant operational problems, including defects in the security seals, increased lead times, backlogs of customer orders, and increasingly dissatisfied customers. (A.583, A.585, A.610.)

By the start of 2012, TydenBrooks was the largest manufacturer of security seals in the world. However, TydenBrooks was in crisis mode and was losing customers of plastic seals to other manufacturers as a consequence of its layoffs, offshoring initiatives, and seemingly never-ending operational problems. (A.583, A.585, A.630, A.634.)

## B. TydenBrooks Files Lawsuit Against CSS to "Slow Them Down"

As TydenBrooks was struggling to address its endemic manufacturing and service problems, CSS -- a start-up founded in late 2010 -- began manufacturing plastic security seals at the end of 2011. (A.361, A.521.) CSS was joined by several former Stoffel and TydenBrooks employees, including salespeople and engineers, who were either laid off or resigned from TydenBrooks during the

6

tumultuous time of integration.  (A.721, A.767, A.803.)  None of the employees were subject to non-competition agreements, none took any materials with them when they departed, and none were told that any part of TydenBrooks's manufacturing process was a secret.  (A.413, A.416, A.735, A.762, A.769, A.808.) CSS's security seals were manufactured locally in Pomona, New York, giving CSS the advantage of offering many customers higher quality seals at cheaper prices with faster delivery times, and better customer service than TydenBrooks.  (A.575, A.611.)

In early 2012, TydenBrooks recognized that it could not compete with CSS's quality, prices, lead times, or service, and that CSS was a threat to its "largest domestic market share, highest gross margins" and its "leading market share where it is most vulnerable and most profitable."  (A.634.)  Unable to respond competitively, TydenBrooks's executives brainstormed ideas to shut down CSS as a competitor, or possibly even acquire it to further consolidate the domestic market.  (A.574-79, A.584-613, A.627-635, A.645-49.)  TydenBrooks ultimately decided to file a bogus lawsuit in April 2012 to "slow [CSS] down" and to "punch[ ] them hard, in the face, with the legal action."  (A.575, A.632.)

One TydenBrooks executive, Ralph Mallozzi, led the litigation crusade against CSS and in particular sought to use the lawsuit as a means to strike back at the individual defendants -- one of whom he considered his "protégé" -- whom he

7

had a deep-seated, well-documented animus toward.  (A.228, A.576, A.626, A.630.)  The stated purpose of the lawsuit, which was also filed against many of CSS's employees, was to "create the most disruption to the business internally, externally and individually."  (A.632.)  TydenBrooks's lawsuit claimed that CSS and the individual defendants had misappropriated an alleged secret process for manufacturing plastic security seals, stolen trade secret customer information, falsely advertised its products in violation of the Lanham Act and New York General Business Law, and unfairly induced TydenBrooks's former employees to leave.  (A.79-115.)

During the course of discovery, CSS uncovered evidence that TydenBrooks filed this lawsuit without any prior investigation into the merits for the express purpose of disrupting or destroying CSS's competing business.  (A.575.)  CSS also uncovered evidence that TydenBrooks had shared all of its manufacturing processes, including drawings, videos and photos, with Unisto, a large seal manufacturer (A.857-58), never told its employees that any part of its manufacturing process was a secret (A.751), has no corporate records identifying any manufacturing process as a trade secret (A.686), and gave tours of its manufacturing facilities to hundreds (if not thousands) of visitors without telling any of them that any part of the manufacturing process was a trade secret (A.736,

A.770). CSS filed counterclaims against TydenBrooks for filing a sham lawsuit in violation of antitrust laws. (A.149-70.)

On the eve of trial, TydenBrooks withdrew almost all of its claims and settled with most of the defendants in exchange for nothing or a nominal payment, leaving CSS and three individual defendants. (A.55-56 [Dkt. 203, 214].) TydenBrooks also withdrew nearly all of its claims against CSS, leaving only misappropriation of trade secrets, conspiracy to misappropriate trade secrets, unfair competition, and unjust enrichment. (A.918.) TydenBrooks also withdrew all claims for damages except for recovery of CSS's hypothetical "avoided development costs." (A.802, SAP.18.)

## C. The District Court Precludes CSS's Critical Evidence Before and During Trial

Prior to trial, TydenBrooks filed seven motions *in limine* to exclude a plethora of CSS's evidence, including evidence concerning TydenBrooks's operational problems, virtually identical security seals manufactured by third-party manufacturers, and TydenBrooks's malice toward CSS and its employees. The District Court granted TydenBrooks's motions, precluding CSS from attacking TydenBrooks's measure of damages, presenting the jury with alternative damages calculations, or introducing evidence that showed that TydenBrooks's damages were small or non-existent. (SPA.18, SPA.21, SPA.27.) CSS also was precluded from attacking TydenBrooks's allegations that its manufacturing process was

9

competitively valuable and secret.  (SPA.7, SPA.18, SPA.21; *see also* A.801-02, A.866-77.)

Trial by jury commenced on April 20, 2015, and the District Court continued to exclude CSS's evidence throughout the trial.  TydenBrooks's focus throughout the trial was not on any alleged trade secret; TydenBrooks's counsel and witnesses studiously avoided saying "trade secret," and its manufacturing experts, who had no expertise in plastic security seal manufacturing, were not permitted to testify about the existence of a trade secret.  (SPA.21.)  Instead, they testified that CSS's seals looked like copies of TydenBrooks's seals. (A.700.)  The District Court denied CSS's motion for judgment as a matter of law without argument, despite TydenBrooks's failure to carry its burden on its trade secret claim.  (A.854.)  CSS, through the District Court's continuous adverse rulings excluding CSS's proposed evidence, was prevented from attacking several key elements of TydenBrooks's trade secret claim.  However, when trial concluded on May 4, 2015, the District Court still instructed the jury as though TydenBrooks's trade secret claim was a viable claim.  (A.916-19.)  The jury rendered a verdict in the amount of $3.9 million against CSS, awarding TydenBrooks $1.3 million on three of its four claims:  misappropriation of trade secrets, unfair competition, and unjust enrichment.  (A.926-27.)

CSS filed a motion to vacate or modify the Judgment, which was denied by the District Court on December 28, 2015 without the opportunity for argument. (SPA.67, A.74-75 [Dkt. 342, 353].)

## SUMMARY OF ARGUMENT

The Judgment entered by the District Court should be reversed. First, the District Court erroneously instructed the jury that it could award hypothetical "avoided development costs" as a measure of damages even though such damages are not cognizable under New York law. Compounding that error, the District Court instructed the jury that it could award damages without finding that TydenBrooks had suffered an injury in fact as a proximate cause of misconduct by CSS.

Second, the District Court improperly allowed the jury to award TydenBrooks $1.3 million in damages three times on three different causes of action that were based on the same misconduct and sought compensation for the same injury. In an attempt to rectify this error after trial, the District Court increased the award on the misappropriation claim to $3.9 million. This additur is constitutionally impermissible.

Third, the District Court failed to conduct a fair trial by refusing to allow CSS to submit evidence in its defense. In a series of rulings, the District Court improperly excluded categories of evidence that proved that CSS did not

11

misappropriate any valuable trade secret or proprietary information. In excluding this evidence, the District Court erroneously imposed a far higher standard for relevance and a far lower standard for prejudice than is recognized in this Circuit. It also ignored well established rules concerning the admissibility of testimony from lay witnesses and the proper scope of cross-examination of fact and expert witnesses. This denial of a fair trial constituted an abuse of discretion.

## ARGUMENT

### I.      Standard

This Court reviews *de novo* the District Court's instructions to the jury, *e.g.*, *Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001), and reviews the District Court's decisions to award duplicative damages and exclude CSS's evidence for abuse of discretion. *See, e.g.*, *Branum v. Clark*, 927 F.2d 698, 707 (2d Cir. 1991); *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 123 (2d Cir. 2010).

### II.     The District Court Committed Reversible Error by Giving Erroneous Damages Charges to the Jury

It is a universal principle of law that compensatory damages are designed to compensate the injured party for the injury sustained, and nothing more. *Vermont MicroSystems, Inc. v. Autodesk, Inc.*, 138 F.3d 449, 452 (2d Cir. 1998). Accordingly, a plaintiff cannot recover compensatory damages for more than they have been injured. *See, e.g.*, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011

n.15, 1012 (1984); *Racich v. Celotex Corp.*, 887 F.2d 393, 396 (2d Cir. 1989);

*Electrolux Corp. v. Val-Worth, Inc.*, 6 N.Y.2d 556, 571-72 (N.Y. 1959).

Here, the District Court committed reversible error that permitted TydenBrooks to recover damages in excess of actual loss by giving improper damages instructions to the jury. First, the District Court allowed TydenBrooks to pursue an unrecognized theory of damages, which produced an inflated damage figure far in excess of legally recognized damages. Second, the District Court instructed the jury that it could find damages without determining that an injury to TydenBrooks was proximately caused by CSS. Each of these rulings constitute an independent ground for reversal.

### A. The District Court Erred by Instructing the Jury That TydenBrooks Could Recover as Damages Hypothetical Avoided Development Costs

Pursuant to well-established New York law, the damages recoverable in an action for misappropriation of trade secrets or confidential information "may be measured either by the plaintiff's losses or by the profits unjustly received by the defendant." *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 87 (2d Cir. 1991) (citations omitted). Similarly, damages in unfair competition cases are typically determined by plaintiff's lost profits. *American Safety Table Co. v. Schreiber*, 415 F.2d 373, 380 (2d Cir. 1969).

13

From the inception of this case, TydenBrooks sought to recover damages for
its own losses, and had evidence available to establish those losses and CSS's sales
and gross profits.[2]  It also had a damages expert ready, willing, and able to
calculate a reasonable royalty.  (A.516.)  On the eve of trial, however,
TydenBrooks abandoned its claim for traditional damages and elected to move
forward on a speculative theory of damages:  CSS's "avoided development costs,"
which its expert, Dr. Vigil, testified were in the range of $7.8 to $16.6 million.
This estimate, which was based on a series of assumptions made by another expert
as to the hypothetical amount of time and labor it may have required to build a new
manufacturing process (A820-22), was significantly higher than TydenBrooks's
actual losses, CSS's gross profits, or a reasonable royalty, which were in the
hundreds of thousands of dollars.[3]

---

[2] In each of its complaints, TydenBrooks alleged that it suffered damages in the
form of lost business and loss of market share, and separately sought disgorgement
of CSS's profits.  (*See, e.g.*, A.100-09, A.113.)  TydenBrooks's damages expert
acknowledged in his expert report that there was evidence of both TydenBrooks's
lost sales and CSS's gross profits.  (A.544-46.)

[3] TydenBrooks's corporate representative testified that TydenBrooks had lost
profits of less than $600,000.  (A.178-79.)  Based on TydenBrooks's damages
expert's calculation of CSS's sales revenues of $4.1 million (A.547), and applying
the market royalty rate of 4.5% determined by a third-party valuation company
hired by TydenBrooks (A.972), a reasonable royalty would have resulted in
$184,500 in damages.

The District Court permitted TydenBrooks to use hypothetical development costs as a proxy for TydenBrooks's losses and CSS's gross profits[4] (SPA.40), despite the District Court's acknowledgment that there was evidence of TydenBrooks's losses and CSS's gains. (SPA.43-44.) This was reversible error.

Courts only diverge from straight lost profits analysis in misappropriation and unfair competition cases where there is insufficient evidence of a plaintiff's losses or a defendant's profits. *See Vermont MicroSystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142, 151 (2d Cir. 1996); *LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 503 (S.D.N.Y. 2002). In such cases, New York courts allow a third measure of damages as a proxy for actual damages: a reasonable royalty. *See, e.g.*, *LinkCo, Inc. v. Fujitsu Ltd.*, 232 F. Supp. 2d 182, 186-87 (S.D.N.Y. 2002);[5] *LinkCo, Inc. v.*

---

[4] At trial, the District Court charged the jury that "TydenBrooks seeks damages on each of its claims . . . based on the defendants' avoided costs." (A.918.) The District Court instructed the jury that it was to evaluate "the actual costs [CSS] incurred using TydenBrooks'[s] manufacturing process with the cost that [CSS] would have incurred had [it] not misappropriated and/or unfairly utilized TydenBrooks's manufacturing process and had instead developed from scratch [its] own process for manufacturing plastic indicative security seals." (A.918.) The jury was not instructed as to any other measure of damages. CSS objected to this measure of damages prior to trial (A.66 [Dkt. 289]), during trial (A.848, A.875), and after judgment (SPA.39). The District Court did not address the substance of CSS's damages arguments before or during trial, and denied CSS's motion for judgment as a matter of law (SPA.39-45.)

[5] Where, as here, a defendant's net profit cannot be calculated or is a loss, courts apply a reasonable royalty to a defendant's sales as a proxy for defendant's gains. The royalty must be objectively reasonable, that is, based on what the parties

15

*Fujitsu Ltd.*, 230 F. Supp. 2d at 503. However, a court may not apply the reasonable royalty doctrine, which is a less accurate measure of a plaintiff's actual losses, where a plaintiff's losses or a defendant's gains are measurable. *See, e.g.*, *Vermont MicroSystems*, 138 F.3d at 450; *Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 969 (2d Cir. 1997). To hold otherwise would allow speculation in place of proof and create the risk of awarding compensation in excess of a plaintiff's actual loss. [6]

In reaching its conclusion that TydenBrooks's "losses" or CSS's "gains" could be liberally construed to include a new, speculative measure of damages based solely on a defendant's hypothetical avoided development costs, the District Court misread applicable law. It cited *LinkCo, Inc. v. Fujitsu Ltd.*, 232 F. Supp. 2d

---

would have agreed to as a fair licensing price at the time the misappropriation occurred. *LinkCo*, 232 F. Supp. 2d at 186.

[6] The District Court asserted that Dr. Vigil noted in his expert report that he was unable to precisely quantify the exact amount of sales TydenBrooks lost and that he testified at trial that avoided costs was therefore a more appropriate method of calculating damages in this case. (SPA.43-44.) First, Dr. Vigil's report was not submitted as evidence at trial and he did not testify that he could not calculate TydenBrooks's lost sales. Nor did he testify that avoided costs was a more appropriate method of calculating damages. He merely testified that he calculated damages based on avoided development costs. (A.819, A.824.) He never said why and, as discussed *infra*, §IV.A.5, the District Court improperly precluded CSS from cross-examining him on this subject. Second, even if TydenBrooks's lost sales were difficult to quantify, CSS's sales were quantified and Dr. Vigil, an expert on calculating reasonable royalties, never said it would be difficult to calculate a royalty in this case.

16

182 (S.D.N.Y. 2002) (*see* SPA.41), as authority for diverging from a straight lost profits analysis. But *LinkCo* approved of using a reasonable royalty only "where plaintiff's losses and defendant's actual gain cannot be easily computed." 230 F. Supp. 2d at 503. There, the plaintiff, which had gone out of business, had no lost sales and the defendant had no profits. The same is true for other authority relied upon by the District Court.[7] Here, TydenBrooks's losses and CSS's gains were calculable. (SPA.43-44.) However, because TydenBrooks was unhappy with the amount of its actual losses, it persuaded the District Court to improperly use a speculative and unnecessary proxy for calculating damages. No case sanctions use of hypothetical avoided costs to measure a plaintiff's losses or a defendant's gain where an objective measure is available.

Although the District Court found otherwise, no New York court has ever recognized a defendant's "avoided development costs" as a measure of damages for misappropriation of confidential information. In *Matarese*, which is not a trade secret case, this Court affirmed an award of unjust enrichment based upon the defendant's savings of *operating costs*, not *development costs*; in other words, the defendant received concrete day-to-day savings rather than hypothetical savings.

---

[7] In *Matarese v. Moore-McCormack Lines*, 158 F.2d 631 (2d Cir. 1946), the plaintiff had no lost sales and the defendant had no profits from unfair sales. In *In re Cross Media Marketing Corp.*, 06 Civ. 4228, 2006 WL 2337177 (S.D.N.Y. Aug. 11, 2006), the plaintiff pointed to no losses and the defendant made no profit from its theft.

*Matarese*, 158 F.2d at 635-36.[8]  *In re Cross Media* did not award the plaintiff the *defendant's avoided development costs*, but awarded the plaintiff compensation in the amount of the *plaintiff's own development costs*.  *Cross Media*, 2006 WL 2337177, *2.  Similarly, *LinkCo* never stated that a defendant's avoided development costs could be used as a benchmark for misappropriation damages. Instead, it held that a reasonable royalty was the proper measure of damages and a *plaintiff's own development costs* can be considered in determining a reasonable royalty.  *LinkCo*, 232 F. Supp. 2d at 186.

Not only does New York not condone the use of this speculative "avoided development costs" measure of damages, but no court in the country has permitted such damages where losses or profits can be measured.  *See, e.g.*, *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 539 (5th Cir. 1974) ("If the defendant enjoyed actual profits, a type of restitutionary remedy can be afforded the plaintiff[.]"); *Sperry Rand Corp. v. A-T-O, Inc.*, 447 F.2d 1387, 1393 (4th Cir. 1971) (holding that plaintiff's losses is "more appropriate measure of recovery" than defendant's speculative gains); *In re Mud King Prods., Inc.*, 13-BR-

---

[8] The District Court's citation to the Restatement of Unfair Competition is similarly inapposite, as the Restatement speaks to a comparison of *operating costs*, not hypothetical *start-up or development costs*.  (SPA.41.)  TydenBrooks presented no evidence about CSS's operating costs or its own development costs; TydenBrooks's evidence was premised entirely upon the hypothetical cost it would have taken for CSS to develop a manufacturing process from scratch.

32101, 2015 WL 862319, *6 (S.D. Tex. Feb. 27, 2015) ("[W]here . . . the defendant has used the plaintiff's trade secret and derived profits from that use, development costs that the defendant avoided generally are not available.").  A recent decision has recognized that "no case allows development costs where defendant's profits are shown."  *In re Mud King Prods., Inc.*, 514 B.R. 496, 524 (Bankr. S.D. Tex. 2014).

None of the cases cited by the District Court from other Circuits award the same type of avoided development costs charged to the jury by the District Court's instructions.  Indeed, certain cases involve avoided *operating costs*.  *See, e.g.*, *International Indus., Inc. v. Warren Petroleum Corp.*, 248 F.2d 696, 699 (3d Cir. 1957) (comparing cost of transportation with and without use of trade secret).  Several other cases treat a *plaintiff's development costs* as a proxy for the *plaintiff's losses*, *i.e.*, compensating the plaintiff for its *own development costs*.  *See, e.g.*, *Telex Corp. v. IBM Corp.*, 510 F.2d 894, 932 (10th Cir. 1975) (affirming damages premised upon actual development costs by trade secret owner); *Avery Dennison Corp. v. Four Pillars Enter. Co.*, 45 F. App'x 479 (6th Cir. 2002) (damages expert relied on plaintiff's own development costs).  Other cases premise the avoided development costs on the development costs and time of *third parties*.  *See, e.g.*, *Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704, 709-10 (9th Cir. 2003) (development cost determined based on "credible evidence from the industry"

including development time of competitor); *see also* Restatement (Third) of Unfair Competition § 45, cmt. f (2000) ("[T]he court may consider the actual development costs of the plaintiff and, if available, the development or reverse engineering costs of third persons.").  One case involved an award for the *lost value of the company*, and has nothing to do with avoided development costs.  *See Wellogix, Inc. v. Accenture, LLP*, 716 F.3d 867, 880-81 (5th Cir. 2013) (compensatory damages measured by market value of business before and after misappropriation).[9]

This is not a case in which there was no other remedy available to TydenBrooks unless the District Court constructed a pseudo-equitable measure of damages as a proxy.  TydenBrooks and CSS were operating companies with measurable losses and gains upon which to base a measure of damages for any misappropriation.  In its zeal to maximize its recovery, TydenBrooks persuaded the District Court to rely on a speculative and unprecedented theory of damages divorced from the reality that TydenBrooks had suffered relatively minor losses, that CSS had relatively small profits, and that any royalty would have resulted in a

---

[9] Unlike each of these cases, and even though there was some evidence as to plaintiff's development costs, TydenBrooks's damages expert did not base his opinion on TydenBrooks's own development costs or the development costs of any third-party manufacturer, instead relying entirely on speculation about what it might have cost CSS to develop its manufacturing process without any benchmark to real-life development costs.  (A.548-51.)

*de minimis* award of damages.  Moreover, TydenBrooks's damages calculation was supported by nothing more than the opinion of its damages expert, who did not rely on TydenBrooks's development costs, or the actual development costs of competing manufacturers.  Accordingly, the Judgment should be reversed and TydenBrooks's claims dismissed for failure to establish any cognizable damages.

**B.    The District Court Erred by Not Instructing the Jury on the Requirement That TydenBrooks Must Have Sustained an Injury in Fact as a Result of CSS's Alleged Misconduct**

The District Court erred by providing confusing jury instructions that failed to advise the jury that TydenBrooks must have sustained an injury in fact as a direct result of CSS's conduct, and invited the jury to conflate the measure of damages with the fact of damages.  This was reversible error.

Trade secret misappropriation, unfair competition, and unjust enrichment all require proof of causation and injury; none are strict liability.  As the Supreme Court emphasized in *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984), damages are measured in trade secret cases by evaluating the competitive injury suffered by the plaintiff.  *Id.* at 1011 n.15, 1012.  In unfair competition cases, injury is measured by lost sales resulting from the misconduct.  *See Electrolux Corp. v. Val-Worth, Inc.*, 6 N.Y.2d 556, 571-72 (N.Y. 1959); *see also LinkCo*, 230 F. Supp. 2d at 502-03 (for unfair competition claim, plaintiff must proffer "sufficient evidence of damages *as a result of* [defendant's] misappropriation of information" and

21

"[t]he losses must be *directly attributable* to the unfair acts of defendant")
(emphasis added). In unjust enrichment cases, equity intervenes where a person
seeks to "enrich himself unjustly *at the expense of another*." *Miller v. Schloss*, 218
N.Y. 400, 407 (N.Y. 1916) (emphasis added); *see also Goldemberg v. Johnson &
Johnson Consumer Companies, Inc*., 8 F. Supp. 3d 467, 483 (S.D.N.Y. 2014).

Although the District Court provided some generalized instructions with
respect to injury and causation, it failed to instruct the jury that TydenBrooks
needed to establish a financial injury that directly resulted from CSS's conduct
before it could use avoided costs as a measure of damages. Instead, the District
Court effectively instructed the jury to consider CSS's alleged avoided
development costs as TydenBrooks's damages.[10] The jury was instructed that
damages were "calculated on the basis of the *benefits derived* by [CSS]," and were
further instructed to examine nothing more than (1) CSS's research and
development savings, (2) CSS's early market entry, and (3) operating cost savings.
(A.918-19.) The District Court conflated CSS's gains with TydenBrooks's
injuries, holding that "Tyden[Brooks] offered evidence that . . . CSS was able to
avoid costs that it would have otherwise incurred to develop such processes [and]

---

[10] TydenBrooks's counsel explicitly -- and repeatedly -- acknowledged this
conflation of TydenBrooks's injury with CSS's avoided costs. (A.925 ("The injury
that we're measuring is avoided costs[.]"), ("If CSS had avoided costs, by
definition, there's injury."); *see also* A.922, A. 924.)

[t]his evidence was sufficient for a reasonable jury to conclude that [CSS's] actions proximately caused Tyden[Brooks]'s injuries[.]"  (SPA.48.)

However, a gain to CSS is not the equivalent of an injury to TydenBrooks, nor does it satisfy the elements of causation and injury, *i.e.*, "economic harm," mandated by law.  The Supreme Court of the United States and the New York Court of Appeals have both rejected the notion that a defendant's gain necessarily comes at the expense of the plaintiff.  In *Straus v. Notaseme Hosiery Co.*, 240 U.S. 179 (1916), the Supreme Court reversed an award of damages to the plaintiff for all profits defendant gained from sales generated after it engaged in unfair competition.  There, the parties were both sellers of hosiery and the defendant used a label on its hosiery that was deceptively similar to the plaintiff's label.  Reversing the award of damages, the Supreme Court observed that there was no evidence showing a direct connection between the defendant's sales gains and any injury to the plaintiff.  Indeed, there was evidence that one party's sales gains may not have had any impact on the other.  Among other things, the companies were in different states, sold to different customers, and called their product by different names.  Thus, proof of unfair competition and gain to the defendant was inadequate to establish that the defendant proximately caused an injury to the plaintiff.

Likewise, in *Michel Cosmetics v. Tsirkas*, 282 N.Y. 195, 202 (1940), the New York Court of Appeals reversed an award of damages based on the

23

defendants' profits from its misappropriation of the plaintiff's secret manufacturing process.  In that case, the plaintiff, a lipstick manufacturer, brought an action against the defendants for wrongfully manufacturing lipsticks in accordance with formulas and processes belonging to the plaintiff and placing the lipsticks in containers similar to the container used by the plaintiff, with the object of deceiving buyers into the belief that they were buying the product of the plaintiff. The lower court awarded damages for all profits that the plaintiff would have made on the lipsticks manufactured and sold by the defendants.  Even though defendants did not appeal the measure of damages, the New York Court of Appeals reversed the award of damages because there was no evidence in the record (such as a reduction in the plaintiff's sales volumes) to support measuring the plaintiff's damages by the sales gained by the defendants.  In so holding, the New York Court of Appeals stated that in all cases, there must be evidence showing that the defendant's wrongful acts have caused the plaintiff to suffer a commensurate decrease of profits.  This is because "[t]here is no presumption of law or of fact that a plaintiff would have made the sales that the defendant made." *Id.* at 202 (*citing Dickinson v. Thum Co.*, 8 F.2d 570, 575 (6th Cir. 1925)).  The Court of Appeals held that although the evidence may have been sufficient to permit the inference that the defendants caused some loss of profits to the plaintiff, it was insufficient to sustain even a partial recovery.  *Id.* at 204.

24

Applying these principles, New York courts deny recovery of damages where a plaintiff fails to provide a causal link between a defendant's gains and the plaintiff's own losses.[11] *See, e.g.*, *Ronson Metal Art Works v. Gibson Lighter Co.*, 3 A.D.2d 227, 229 (1st Dep't 1957) (reversing award of defendant's profits where plaintiff "offered no proof to establish any causal relationship between those profits and its own losses"); *Florczak v. Oberriter*, 50 A.D.3d 1440, 1442 (3d Dep't 2008) (affirming dismissal of plaintiff's claim where plaintiff failed to show any lost business caused by defendant's conduct); *see also Electrolux*, 6 N.Y.2d at 571-72 (requiring damages to be measured as "any loss in business *which can be traced directly* to [defendants' conduct]") (emphasis added).

TydenBrooks failed to offer any evidence that it suffered lost sales, a lower profit margin, or any other economic injury as a result of CSS's entry to the

---

[11] Even non-New York courts that permit juries to examine "avoided costs" as a component of damages still require proof of causation of injury; any award that is divorced from injury to the plaintiff is denied as speculative. *See, e.g.*, *University Computing*, 504 F.2d at 547 ("We approve the clear instructions to the jury that if they had decided the *plaintiff suffered no actual injury they were to find for the defendants*[.]") (emphasis added); *Wellogix v. Accenture, LLP*, 716 F.3d 867, 879-80 (5th Cir. 2013) (requiring that "the use of trade secrets *results in economic injury*" and finding "that this misappropriation created a *competitive disadvantage*; that this disadvantage *caused* [plaintiff's] value to drop to 'zero'; and that this disadvantage also *caused* [plaintiff] to lose out on potential deals") (emphasis added); *Telex Corp. v. I.B.M. Corp.*, 510 F.2d 894, 933 (10th Cir. 1975) (rejecting increased security costs as "*speculative*" where court could not "perceive how the increased security costs were the *proximate result* of Telex's hiring of IBM employees") (emphasis added).

security seals market or savings in development or operating costs.  TydenBrooks

simply argued that if CSS gained something, TydenBrooks must have lost

something, but failed to prove what that loss was, or how much it lost.  *George W.*

*Luft Co. v. Zande Cosmetic Co.*, 142 F.2d 536 (2d Cir. 1944) (reversing damage

award for unfair competition where evidence did not prove that all defendant's

gains were necessarily plaintiff's losses); *cf. American Safety Table Co.*, 415 F.2d

at 381 (injury and causation adequately shown where parties were sole competitors

for the lost sales); *Electro-Miniatures v. Wendon*, 771 F.2d 23, 27 (2d Cir. 1985)

(same).

The District Court further held that "CSS's interference with

Tyden[Brooks]'s trade secret was the injury that the damages in this case were

intended to rectify."  (SPA.47.)  But the District Court misapplies the law, which

finds that interference with a plaintiff's *exclusive access* to a trade secret may

constitute injury because disclosure would *destroy that competitive edge*.[12]

TydenBrooks offered no proof at trial that it ever had exclusive ownership over its

---

[12] The District Court's reliance on *Ruckelshaus*, 467 U.S. 986, and *In re Cross Media Mktg. Corp.*, No. 06 Civ. 4228, 2006 WL 2337177 (S.D.N.Y. Aug. 11, 2006) is misplaced, as both courts found that "the economic value of th[e] property right lies in the competitive advantage over others that [plaintiff] enjoys by virtue of its exclusive access to the data, and disclosure or use by others of the data would destroy that competitive edge."  *Ruckelshaus*, 467 U.S. at 1012; *see In re Cross Media*, 2006 WL 2337177 at *4.  No such finding was made here, nor could it be, given TydenBrooks's failure to present any proof of such exclusivity.

manufacturing process, or that its purported loss of exclusive ownership caused any injury at all, let alone the exact same amount of injury as CSS's avoided development costs.  TydenBrooks made no attempt to value its exclusive ownership over its manufacturing process.  Rather, counsel for TydenBrooks repeatedly stated on the record that its injury was simply that CSS gained an advantage.  (A.922, A.925.)  As a result, TydenBrooks's claims were transformed into strict liability, freeing it from any obligation to establish injury or causation.

The District Court's error in the improper damages instruction was amplified by its instructions to the jury on each of the three claims where the jury returned a verdict of liability against CSS.  For each of trade secret misappropriation, unfair competition, and unjust enrichment, the court omitted any proximate causation and injury instruction as part of the claim.  (A.916-18.)  Notably, the conspiracy claim – *i.e.*, the only claim the jury found no liability against CSS or the other defendants (A.926) – was the only cause of action that explicitly required proof of causation and injury as a distinct element of the claim.  (A.917 (". . . the conspiracy to steal TydenBrooks's trade secret *caused injury* to TydenBrooks") (emphasis added).)  In a note to the District Court during deliberations concerning the conspiracy claim, the jury asked for clarification about what was meant by "injury to Plaintiff." (A.921.)  The District Court rejected CSS's request that the jury be instructed that "injury to Plaintiff" means that TydenBrooks must prove it was injured by the

avoided costs (A.922), or that it suffered financial harm proximately caused by CSS (A.924). Instead, and because there was no evidence of any competitive injury, the District Court instructed the jury that injury means "the conspiracy to steal TydenBrooks's trade secrets *proximately caused injury* to TydenBrooks" (A.925 (emphasis added)). It was error for the District Court not to answer the jury's question. The District Court and counsel for TydenBrooks acknowledged that the jury instruction on damages was unclear and confusing, and that the jury was having a problem connecting avoided costs with injury. (A.922-25.) By telling the jury that causing injury to TydenBrooks means proximately causing injury to TydenBrooks, the District Court not only failed to clear up the jury's confusion, but worsened it because the District Court also told the jury that the damages could be measured by avoided costs.[13] The District Court thus invited the jury to conflate injury with the measure of damages for injury. The fact that elsewhere the District Court's damages instruction – separate and apart from the

---

[13] The District Court's standalone instruction to the jury that damages should be limited to "injuries that TydenBrooks proves were proximately caused by [CSS's] allegedly wrongful conduct" (A.918), does not cure these errors. The avoided costs damages instruction provided absolutely no grounds for the jury to even examine injury to TydenBrooks as a relevant factor in determining damages, and the jury's verdict of no liability for the conspiracy claim (which made causation and injury an express element of the claim), when combined with their express concern about the definition of "injury" only in the context of the conspiracy claim, shows that the jury was not assessing injury or causation with regard to the three claims CSS was ultimately found liable under.

28

claims instructions – included instructions on proximate causation and injury is insufficient in light of the misleading jury instructions and the jury's apparent confusion. Thus, each of the claims should have explicitly required proof of injury caused by CSS. [14]

TydenBrooks cannot avoid its obligation to prove causation and injury by relying upon avoided development costs, and the District Court erred by granting judgment to TydenBrooks without any proof that CSS caused any injury – let alone $3.9 million of injury – to TydenBrooks, whether it saved development costs or not. Accordingly, the Judgment should be reversed and the case remanded.

---

[14] The District Court wrongly found that CSS is procedurally barred from raising this argument because "CSS had the opportunity" but "did not articulate any additional grounds for a directed verdict or challenge the sufficiency of Tyden[Brooks]'s evidence for either proximate cause or injury." (SPA.46.) First, CSS was not given the opportunity to be heard after the close of TydenBrooks's case; the District Court merely permitted counsel to "list[] the motions he want[ed] to have to be deemed to have been made at the close of plaintiff's case." (A.848.) Second, courts may grant judgment as a matter of law even when an issue has not been previously raised in a motion where not doing so would result in "manifest injustice," such as when a court's jury instructions are "wholly without legal support." *Welch v. United Parcel Serv., Inc.*, 871 F. Supp. 2d 164, 177-78 (E.D.N.Y. 2012) (finding manifest injustice would result if defendant is held liable under a law which, based upon the evidence, does not apply to its conduct); *Doctor's Associates, Inc. v. Weible*, 92 F.3d 108, 113-14 (2d Cir. 1996) (finding manifest injustice would result if the court sustained a counterclaim verdict against plaintiffs where defendant did not present evidence in support of the claim). The District Court's citation to *Cruz* in this instance is inapposite (SPA.46), as the court there found that the jury's damages award was reasonable where plaintiffs demonstrated "virtually to the penny" how the jury might have arrived at the damages it awarded. *Cruz v. Local Union No. 3 of Int'l Bd. of Elec. Workers*, 34 F.3d 1148, 1156-58 (2d Cir. 1994).

**III.    The District Court Erred by Granting Judgment to
TydenBrooks to Recover the Same Damages Three Times on
Three Alternative Claims Seeking the Same Relief**

The District Court erroneously upheld the jury's duplicative verdict, which

awarded $1.3 million to TydenBrooks for each of its misappropriation of trade

secrets, unfair competition, and unjust enrichment claims.  (SPA.59-67, A.926-27.)

A party cannot collect damages three times for a single injury.  This is exactly

what the Judgment accomplishes, and this is reversible error.

It is a fundamental principle of law that "[i]f two [or more] causes of action

provide a legal theory for compensating one injury, only one recovery may be

obtained."  *Bender v. City of N.Y.*, 78 F.3d 787, 793 (2d Cir. 1996); *see also*

*Hughes v. Patrolmen's Benevolent Ass'n of the City of N.Y., Inc.*, 850 F.2d 876,

882 (2d Cir. 1988), *cert. den.* 488 U.S. 967 (1988) (a verdict "cannot . . . provide

damages for the same injuries caused by the same conduct"); *Wickham*

*Contracting Co. v. Board of Educ. of City of N.Y.*, 715 F.2d 21, 28 (2d Cir. 1983)

(separate recoveries under Sherman Act and Labor Management Relations Act for

economic harm arising from unfair labor practices not permissible); *see also*

*Diversified Graphics Ltd. v. Groves*, 868 F.2d 293, 295 (8th Cir. 1989) (reversing a

judgment that aggregated cumulative damages, even though the jury intended the

verdicts to be cumulative).

The District Court charged the jury that "TydenBrooks seeks damages on *each of its claims* -- misappropriation of trade secrets, civil conspiracy, unfair competition, and unjust enrichment -- based on the defendants' avoided costs." (A.918 (emphasis added).)  At no point did the District Court distinguish between the claims in instructing the jury on the avoided costs measure of damages; at no point did TydenBrooks distinguish between savings or any competitive advantage between any of the claims.  The jury returned a verdict against CSS for $1.3 million for trade secret misappropriation, $1.3 million for unfair competition, and $1.3 million for unjust enrichment.  (A.926-27.)  However, once TydenBrooks was awarded $1.3 million for CSS's savings for trade secret misappropriation premised upon CSS's saved costs and early entry to the market, any additional award for the very same savings and/or early entry is *per se* duplicative of the trade secret misappropriation damages award.

Nevertheless, the District Court improperly permitted TydenBrooks's triple damages to stand, relying on case law that "the possibility of non-duplicative awards is enough to sustain the jury verdict."  (SPA.59 (*citing MacDermid Printing Sols., LLC v. Cortron Corp.*, 08 Civ. 1649, 2015 WL 251527, at *12 (D. Conn. Jan. 20, 2015) *quoting Bseirani v. Mahshie*, 107 F.3d 2, at *2 (2d Cir. 1997)).)  However, such a "possibility" only exists where the jury could rationally find that a cumulative award split across different causes of action compensates

31

*separate injuries*.  Each of the District Court's cited authority affirms that if "the jury's verdict can only reasonably be interpreted as compensating certain injuries more than once," it would be "impermissible" to uphold such a result. *MacDermid*, 2015 WL 251527, at *10.[15]  Whether two or more causes of action seek a remedy for a single injury depends on whether the theories are based on the same, identical, operative facts.  *See Conway v. Icahn & Co.*, 16 F.3d 504, 511-12 (2d Cir. 1994).  Here, TydenBrooks sought damages arising from the misappropriation of its manufacturing process for making plastic security seals under three different theories:  misappropriation of trade secrets, unfair competition, and unjust enrichment.  TydenBrooks's theory of recovery was based on a single set of identical facts (*i.e.*, CSS's purported misappropriation and use of TydenBrooks's alleged proprietary manufacturing process), and TydenBrooks's sole form of damages sought (*i.e.*, CSS's avoided development costs) was predicated on those unitary facts.  The jury was instructed that TydenBrooks was seeking the same damages for each of its claims.  (A.918.)  Moreover, the District Court itself held that TydenBrooks's three causes of action compensate a single

---

[15] In *Bseirani*, for example, this Court specifically noted that the jury found separate injuries, awarded equal amounts of smaller damages on each claim that equaled the total amount of damages sought and stressed that a jury cannot award multiple damages for the same injury.  107 F.3d at *2-3.  Moreover, in *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490 (2d Cir. 1995), not only were the awards distinct amounts given to each claim, but this Court found it "rational" to believe that the jury found two separate injuries. *Id.* at 497.

alleged injury: "CSS's interference with Tyden[Brooks]'s trade secret." (SPA.47.)
Under such circumstances, where "damages are sought for the same illegal acts
under different legal theories . . . a *single recovery* [is] allowed[.]" *Wickham*, 715
F.2d at 28 (emphasis added).

The District Court erroneously hypothesized that "the jury found that
Tyden[Brooks] suffered $3.9 million worth of damages and merely divided the
award over three causes of action." (SPA.59.) First, as noted above, losses cannot
be split across causes of action unless distinct injuries were sustained under the
various claims. Otherwise, by definition, the damages are duplicative or the claims
are duplicative. Second, the District Court based its speculation on the fact that it
instructed the jury not to make a duplicative award. But the jury was also
instructed that damages for each claim were to be measured by avoided costs and it
should calculate avoided costs for each claim. Following those instructions, the
jury awarded the same $1.3 million of avoided costs on each claim.[16] The District
Court continued:

> In any event, to the extent that these claims or damages
> could be found to be duplicative, in light of the jury's
> clear intent that the amount of damages to be awarded
> was $3.9 million – *intent manifested* both by the jury's
> response to questions and *by the body language of the*

---

[16] There is no support in the record for a damage figure of $3.9 million.
TydenBrooks's expert testified to damages well above $3.9 million (A.822), and
the jury obviously did not accept his testimony.

> *individual jurors* – that amount should be awarded on the
> theft of trade secrets claim and nothing should be
> awarded on the unjust enrichment and unfair competition
> claims.

(SPA.66-67 (emphasis added).)  It is not clear what "body language" the District

Court felt "manifested" the "jury's intent" that damages were not duplicative, but

the law does not support awarding damages based on a jury's "body language."  As

to the jury's response to questions, the jury did not indicate that TydenBrooks

suffered $3.9 million worth of damages that should be split into three; rather, it

found that avoided costs were $1.3 million and said that the three $1.3 million

avoided cost awards should be added together such that the total amount of

damages to be awarded was $3.9 million.  (A.926-28.)

But it does not matter if the jury intended to award a total of $3.9 million in

damages by awarding $1.3 million in avoided costs three times.  As this Court

observed in *Conway*, "[r]egardless of the jury's intentions," where "it is clear that

the separate awards were duplicative and therefore impermissible," the award

cannot stand.  *Conway*,16 F.3d at 511.  *Conway* is directly on point.  There, the

jury returned an award of $357,240 on each of two claims, for negligence and

breach of fiduciary duty, respectively.  When polled, the jury confirmed its

intention to make the award cumulative.  On appeal, this Court reversed, noting

that both claims arose from the same misconduct -- the defendant broker's

unauthorized selling from the plaintiff's account -- and it was clear from the way

the damages were calculated that the breach of fiduciary damage award was duplicative of the negligence award and compensated for the same injury. Distinguishing *Gentile v. County of Suffolk*, 926 F.2d 142 (2d Cir. 1991), the *Conway* court concluded, "we do not find it conceivable that the jury split Conway's sellout losses between the two claims submitted to it." *Id*. at 512 (finding duplicative damages where there was a single injury which led to a single set of damages); *cf. Gentile*, 926 F.2d at 154 (finding non-duplicative damages where there were multiple injuries which could have given rise to non-overlapping damages).

Here, too, it is inconceivable that the jury was compensating for different injuries when it awarded the same damages on the three claims. The claims were all based on the same alleged misconduct (theft of TydenBrooks's manufacturing process), sought the exact same damages (avoided costs), and for the same alleged injury (CSS's interference with TydenBrooks's trade secret). Accordingly, where, as here, "a jury award duplicates damages, the court should, at the conclusion of the trial, . . . reduce the judgment by the amount of the duplication and thereby prevent double [or triple] recovery." *U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1259-60 (10th Cir. 1988) (internal quotation and citation omitted); *see also Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93, 97 (2d Cir. 1995) (affirming reduction of duplicative award).

The District Court ignored this authority and came up with a different solution: "to the extent these claims or damages could be found duplicative," the "[$3.9 million] should be awarded on the theft of trade secrets claim and nothing should be awarded on the unjust enrichment and unfair competition claims." (SPA.67.) There is no authority whatsoever for a district court to take such action. Indeed, it is constitutionally impermissible for a district court to increase a jury's award.[17] *Elyse v. Bridgeside Inc.*, 367 F. App'x 266, 267 (2d Cir. 2010) ("additur is constitutionally impermissible"); *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1331 (2d Cir. 1990) (additur is considered an unconstitutional reexamination of a jury verdict) (*citing Dimick v. Schiedt*, 293 U.S. 474, 484-86 (1935)).

The District Court's Judgment, permitting TydenBrooks to collect the exact same amount of damages for the exact same alleged misconduct causing the exact same alleged injury *three times* is reversible error. Accordingly, the Judgment should be reversed and the case remanded.

## IV. CSS Was Denied a Fair Trial Because of the District Court's Improper Preclusion of Evidence in Support of CSS's Defense Theory

CSS should be afforded a new trial because of the District Court's numerous erroneous evidentiary rulings both before and during trial, which resulted in a trial that was fundamentally unfair to CSS. *See Rivas v. Brattesani*, 94 F.3d 802, 807

---

[17] The District Court offered no explanation why it felt an award on the trade secret claim was more appropriate than an award on the unjust enrichment claim or more appropriate than reducing the total damage award to $1.3 million.

(2d Cir. 1996) ("It is, of course, the rule that a motion for a new trial must be granted if the trial was not fair to the moving party.")  Where a court's improper exclusion of evidence affects a "substantial right" of one of the parties, the ruling should be reversed and the case remanded for a new trial.  *See Malek v. Fed. Ins. Co.*, 994 F.2d 49, 55 (2d Cir. 1993).  In the words of the Supreme Court, "if one cannot say, with fair assurance . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Kotteakos v. United States,* 328 U.S. 750, 765 (1946).

The District Court, in ruling on CSS's proposed evidence, imposed a far higher standard for relevance and a far lower standard for prejudice than is recognized in this Circuit.  *See, e.g.*, *U.S. v. Southland Corp.*, 760 F.2d 1366, 1375 (2d Cir. 1985) ("[T]he standard of relevance established by the Federal Rules of Evidence is not high."); *U.S. v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 2000) ("The prejudice that Rule 403 is concerned with involves some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.").  The District Court erroneously misapplied these rules of evidence to preclude CSS's proffered evidence on the basis that certain information was not necessary to establish TydenBrooks's theory of its claims, and therefore was irrelevant. However, the District Court, by focusing exclusively on TydenBrooks's theory of its claims, ignored CSS's right to put forward its defense theory to those claims.

37

The evidence excluded was critical to establishing CSS's defenses that TydenBrooks did not have anything of value, that TydenBrooks had suffered no injury from any alleged misappropriation, and that this lawsuit resulted from the personal animus of one of TydenBrooks's key witnesses toward CSS and the former employees it had hired. CSS's key defense evidence included (i) TydenBrooks's internal financial documents attributing zero value to any trade secrets, (ii) testimony from two of TydenBrooks's former employees that TydenBrooks's manufacturing process was very simple and not secret or unique, (iii) evidence that TydenBrooks's manufacturing process was in need of improvements to compete with CSS, (iv) evidence that TydenBrooks's manufacturing process was the exact same as competitors, (v) four dozen plastic seals manufactured by competitors that are identical or similar to TydenBrooks's seals, and (vi) internal TydenBrooks documents showing that the lawsuit was a pretext to slow down fair competition from CSS. The District Court precluded CSS from introducing this essential evidence to the jury, creating a false picture to the jury that TydenBrooks and CSS were the only competitors, cloaking TydenBrooks's manufacturing process with a veil of secrecy and great value, and wiping away TydenBrooks's malicious and anticompetitive motives.

The District Court's rulings, when combined, prevented CSS from putting on an effective defense or presenting the jury with an alternative narrative to the

one TydenBrooks was propounding.[18]  These rulings were in error, were

prejudicial, and affected the outcome of the trial.[19]  As such, the Judgment should

be reversed, and CSS afforded a new trial in which it can put forward its defense

using this key evidence.  *See Arlio v. Lively*, 474 F.3d 46, 51 (2d Cir. 2007)

(holding that a new trial should be granted "when a jury's judgment would be

swayed in a material fashion by the error"); *Rosenfeld v. Basquiat*, 78 F.3d 84, 92

(2d Cir. 1996) (granting a new trial where the court's evidentiary ruling

substantially influenced the jury's verdict); *Malek*, 994 F.2d at 55 (same).

---

[18] As the United States Supreme Court has cautioned, "[a] convincing tale can be told with economy, but when economy becomes a break in the natural sequence of narrative evidence, an assurance that the missing link is really there is never more than second best."  *Old Chief v. U.S.*, 519 U.S. 172, 189 (1997).

[19] These erroneous evidentiary rulings -- including the exclusion of critical probative evidence and limitations on cross-examination -- may have been caused by the District Court's desire to speed up the trial.  Although the parties were informed at the pre-trial conference that the trial would be scheduled for two weeks -- an initial week, a week off, followed by another week to complete the trial -- the District Court surprised counsel on the first day of trial that she intended to charge the jury in a mere four days, saying "Bear in mind, use the time as you wish, but I think we're going to have to charge those guys Thursday afternoon or so.  So you people really better slim it down, and this is not a hard case."  (A.653.)  Although a court certainly has the right to control its own proceedings, that discretion does not permit a court to significantly prejudice a party's right by limiting its evidence and preventing it from defending itself against complicated, multi-million dollar claims of wrongdoing.

### A. The District Court Abused Its Discretion by Excluding Evidence That TydenBrooks's Manufacturing Process Was Not Valuable

To recover damages for trade secret misappropriation, TydenBrooks was obligated to prove that its manufacturing process for plastic security seals was valuable; "the value of a trade secret lies in the competitive advantage it gives its owner over competitors." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011 n.15, 1012 (1984). The jury was charged that a trade secret must give TydenBrooks "an opportunity to obtain an advantage over competitors who do not know or use it" (A.916), and was instructed to evaluate "the value of the information to TydenBrooks and its competitors" (A.916-17). CSS was prepared to introduce multiple pieces of evidence that established that TydenBrooks's manufacturing process had no value and did not provide TydenBrooks with any competitive advantage. However, the District Court repeatedly precluded CSS from introducing at trial these critical pieces of evidence that directly contradicted TydenBrooks's proffer that its security seals manufacturing process was competitively valuable. These rulings were an abuse of discretion, substantially impacted CSS's right to put forward its defense to TydenBrooks's trade secret claim, and affected the jury's verdict that CSS was liable for trade secret misappropriation.

### 1. TydenBrooks's Internal Financial Documents

During trial, CSS sought to introduce four internal financial documents prepared by TydenBrooks or at TydenBrooks's behest to establish that TydenBrooks internally admitted that its manufacturing process was not a trade secret, not a valuable asset, and certainly not worth the $20 million TydenBrooks was seeking as damages: a contemporaneous third-party valuation report prepared for TydenBrooks's directors (the "VRC Report") (A.929-1004), and TydenBrooks's 2010, 2011, and 2012 financial statements (the "Financials") (A.446-509, A.1005-31). CSS intended to introduce the VRC Report to show that TydenBrooks was aware that its manufacturing process was not a trade secret, and of no value. The VRC Report was prepared at TydenBrooks's behest when it acquired Stoffel Seals ("Stoffel"), a competitor that possessed the allegedly secret manufacturing process.[20] (A.933.) The VRC Report evaluated, *inter alia*, Stoffel's intangible assets, and included a simple chart that listed various intangible assets, including "Trade Secrets," and placed a checkmark next to all "identifiable intangible assets" acquired. (A.937.) "Trade Secrets" has no checkmark, and the VRC Report makes clear that all unchecked potential intangible assets were "*deemed to be of little to no fair value*." (*Id*.) The VRC Report was expressly relied upon in TydenBrooks's 2011 financial statement in estimating "the fair

---

[20] CSS offered to authenticate the VRC Report as a business record through the testimony of one of the authors of the VRC Report. (A.802.)

values of assets acquired and liabilities assumed" from the acquisition of Stoffel.

(A.458.) CSS intended to introduce the Financials to show that before this

pretextual lawsuit TydenBrooks did not place any value on any of its alleged trade

secrets. The Financials clearly identify all "intangible assets acquired from Stoffel,

consisting only of "trade names" (valued at $900,000), "patents" (valued at

$3,470,000), "non-compete agreements" (valued at $90,000), a "supply

agreement" (valued at $1,050,000), and "customer relationships" (valued at

$18,010,000). (A.458-59, A.488-89, A.1019.) No value was attributed to any

acquired trade secrets. (*Id.*) The VRC Report and Financials are compelling proof

that TydenBrooks determined that (i) there was no trade secret, and (ii) any alleged

trade secret was of no value. Moreover, this evidence was by no means beyond the

understanding of the average juror.

The District Court excluded these financial documents and the attendant

testimony that CSS sought to elicit concerning the value of TydenBrooks's

manufacturing process, holding that the proposed exhibits were of only slight

probative value and contained complicated subject matter and "esoteric accounting

stuff" beyond the comprehension of the jurors without the assistance of expert

testimony.[21] (A.801-02, A.876-77.) It was an abuse of discretion, however, to

---

[21] The District Court characterized CSS's proffered authenticating witness for the
VRC Report as an undisclosed expert witness rather than a fact witness who
worked on the VRC Report and could authenticate it as a business record. (A.802.)

preclude this highly probative evidence. The District Court's concern that introducing financial documents would "open up a side show of lawyers [] trying to state expert accounting opinions" was unfounded. (A.877.) As the Supreme Court has held, "expert testimony not only is unnecessary but indeed may properly be excluded" where the jurors "are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training." *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962) (citation and quotations marks omitted). Expert analysis is unnecessary where it "would not have provided assistance to the trier of fact beyond that afforded by the arguments of counsel." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 161 (2d Cir. 2012); *United States v. Rigas*, 490 F.3d 208, 221 (2d Cir. 2007) (jury could understand massive accounting fraud without the aid of an accounting expert). Financial documents are permitted to be introduced without expert testimony even where the pertinent documents contain ambiguities; such ambiguities "go[] to the weight and not the admissibility of the evidence." *SEC v. Jasper*, 678 F.3d 1116, 1124 (9th Cir. 2012). Indeed, it might have been error to permit an expert to testify as to the financial documents, because the documents concerned "lay matters which a jury is capable of understanding and deciding without the expert's help." *Andrews v. Metro N. C. R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989); *Snyder v. Wells Fargo Bank, N.A.*, 594 F. App'x 710, 714 (2d Cir.

43

2014) (expert testimony properly excluded at trial where "the jury could understand and assess [explanation of investment preferences] without expert help"). The jury was capable of understanding the significance of "trade secrets" being allocated zero value on a valuation report and the company's financials without the aid of an accounting expert.[22]

CSS was entitled to present the jury with TydenBrooks's own business records and contemporaneous valuations that clearly reflected the absence of any trade secret. The exclusion of this critical evidence had a material effect on the jury's verdict, and was an abuse of discretion.

### 2. George Lundberg's Testimony

During trial, CSS sought to introduce testimony from George Lundberg, TydenBrooks's former Engineering Manager from 1977 to 2012, concerning the lack of competitive value for TydenBrooks's simple manufacturing process. Mr. Lundberg's testimony was not rooted in specialized expertise but rather his personal knowledge and experience working at TydenBrooks for 35 years, including during the period of TydenBrooks's consolidation of competitor security seal manufacturers like Stoffel. Mr. Lundberg possessed unique factual knowledge

---

[22] "Jurors, if properly instructed and treated with deserved respect, bring collective intelligence, wisdom, and dedication to their tasks, which is rarely equaled in other areas of public service." *In re U. S. Fin. Sec. Litig.*, 609 F.2d 411, 430 (9th Cir. 1979) (holding that complex financial case was "not beyond the practical abilities of a jury" and noting that "experience demonstrates that juries are capable of sorting out complex factual issues and applying the law to them").

concerning the manufacturing processes employed by TydenBrooks before and after each acquisition, knowledge that no other witness possessed (including TydenBrooks's single engineering witness, Boyd Coggins, who was only familiar with the manufacturing process employed at Stoffel).

During trial, the District Court precluded Mr. Lundberg from testifying concerning the simplicity and prevalence of TydenBrooks's manufacturing process for plastic security seals, including testimony about how the manufacturing processes employed at EJBrooks and Stoffel were very similar, and how quickly a new assembly and decorating machine could be developed based on his experience at TydenBrooks.  (A.849, A.851-54.)  The District Court's preclusion was premised upon Rule 701 precluding lay witness opinions, and Mr. Lundberg's alleged lack of familiarity with the Stoffel manufacturing process.  (A.851-53.)  Neither of these reasons supports the District Court's preclusion of CSS's critical evidence that directly undermined TydenBrooks's assertions that its manufacturing process had competitive value.

The District Court incorrectly found that Mr. Lundberg's proffered testimony constituted an inadmissible expert opinion because it relied on "his technical experience in the industry" and "technical or other specialized knowledge."  (A.849, A.851-52.)  The Second Circuit has consistently held, however, that a witness's specialized knowledge does not preclude the witness

from testifying, provided that the testimony was rooted in personal perception, regardless of whether the witness could have testified on other matters as an expert. *Rigas*, 490 F.3d at 224; Fed. R. Evid. 701, Advisory Committee Notes (1972) (many Courts have permitted specialized opinion testimony, without first qualifying the witness as an expert, because "the particularized knowledge that the witness has [is derived] by virtue of his or her position in the business"). In *B & G Plastics*, No. 98Civ.0884, 2004 WL 307276 (S.D.N.Y. Feb. 18, 2004), for example, the court permitted lay opinion testimony in a patent case regarding issues of validity and infringement despite the fact that the witness was not a patent expert. *Id.* at *8-9. Here, too, Mr. Lundberg's testimony clearly relates to the particularized knowledge he obtained by virtue of his position as an engineer for TydenBrooks. *Rigas*, 490 F.3d at 224 (testimony properly admitted where witness had personal knowledge of underlying facts); *Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.*, 290 F.3d 98, 111 (2d Cir. 2002) (same); *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 265 (2d Cir. 1995) (same). Even if Mr. Lundberg's testimony was found to constitute a lay opinion, such testimony should be permitted because it "did not depend on the sort of specialized training that scientific witnesses or statisticians rely upon when interpreting the results of their own experiments or investigations." *U.S. v. Yannotti*, 541 F.3d 112, 126 (2d Cir. 2008). Rather, Mr. Lundberg's knowledge stemmed from his *participation* in

46

plastics manufacturing at TydenBrooks both before and after the acquisition of Stoffel. *U.S. v. Cuti*, 720 F.3d 453, 460 (2d Cir. 2013) (lay opinion testimony was proper where "witnesses testified based only on their experiences with matters pertinent to this case, and their reasoning was evident to the jury"); *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 911 (2d Cir. 1997) (rational-basis requirement of Rule 701 "is the familiar requirement of first-hand knowledge or observation") (internal quotations omitted); *U.S. v. Ghavami*, 23 F. Supp. 3d 148, 171-72 (S.D.N.Y. May 15, 2014) (lay witness's opinion concerning "complex financial transactions" was proper when "based on his participation").[23] As such, Mr. Lundberg's testimony was improperly excluded under Rule 701.

The District Court's exclusion of Mr. Lundberg's testimony because of his alleged unfamiliarity with the manufacturing process at issue (A.851-53), was also an abuse of discretion. Mr. Lundberg had extensive knowledge -- gleaned from 35 years of experience -- about a competitor's manufacturing process and had the ability to compare that knowledge to the Stoffel manufacturing process after

---

[23] This same principle is applied throughout the Circuits. *U.S. v. Santiago*, 560 F.3d 62, 66 (1st Cir. 2009) ("Rule 701 is meant to admit testimony based on the lay expertise a witness personally acquires through experience, often on the job.") (citation and quotations omitted); *Teen-Ed, Inc. v. Kimball Int'l, Inc.,* 620 F.2d 399, 403 (3d Cir. 1980) ("The fact that [an accountant] might have been able to qualify as an expert witness on the use of accepted accounting principles in the calculation of business losses should not have prevented his testifying on the basis of his knowledge of appellant's records about how lost profits could be calculated from the data contained therein.").

TydenBrooks's acquisition of Stoffel. Mr. Lundberg testified about his work history, close familiarity with the indicative seals manufacturing process, and direct exposure to the separate iterations of the manufacturing processes employed at TydenBrooks and Stoffel. (A.849.) At TydenBrooks, Mr. Lundberg was in charge of automating some of the company's semi-automated systems for creating plastic seals nearly identical to those produced later on after the acquisition of Stoffel. (A.850-51.) Mr. Lundberg had the additional responsibilities of mold and product designer, including designing new plastic indicative seals and developing processes for manufacturing them. (A.849-50.) Mr. Lundberg testified that after TydenBrooks's acquisition of Stoffel, he was able to view the Stoffel machinery in person and grow familiar with the process Stoffel used, providing him with the unique vantage point for comparing the different companies' processes, something TydenBrooks's only other engineering fact witness, Mr. Coggins, could not provide.[24] (A.849, A.854.) The District Court, by precluding all evidence concerning any manufacturing process other than Stoffel's, prevented CSS from introducing evidence to establish that TydenBrooks's manufacturing process was

---

[24] Similarly, TydenBrooks's experts could not testify as to the manufacturing processes of any plastic security seals manufacturers, because they failed to perform any analysis of competitor processes and were appropriately precluded from offering any opinions as to whether or not TydenBrooks's manufacturing process was a trade secret. (SPA.20-22.)

48

of no competitive value because it was so similar to processes used by competitors, and was easily developed.

CSS was entitled to present the jury with Mr. Lundberg's testimony about TydenBrooks's manufacturing processes and the similarity between the various processes employed by competitors. The exclusion of this critical evidence had a material effect on the jury's verdict, and was an abuse of discretion.

### 3. "Exact Same" Manufacturing Process Documents

During trial, CSS sought to introduce two documents and related testimony from a TydenBrooks board member, Ian Morton, that described the allegedly valuable, secret, and confidential manufacturing process employed by Stoffel as the "exact same" as the manufacturing process already employed by TydenBrooks, directly undermining TydenBrooks's claims that its manufacturing process was highly valuable and unique. Defendants' Trial Exhibit 134 (A.418-45), was signed by three members of TydenBrooks's board of directors, including Mr. Morton, and stated that "Stoffel [a then-competitor of TydenBrooks] has several core manufacturing competencies. . . . *These processes are the exact same as those used by TydenBrooks*." (A.432 (emphasis added).) The other document, Defendants' Trial Exhibit 135 (A.199-226), was emailed by Mr. Morton to an investor in Crimson Investments, the private equity company that owns TydenBrooks, and stated that "[t]he products that Stoffel produces and the associated production

49

processes and equipment are *almost identical to Tyden[Brooks]'s*." (A.213 (emphasis added).) CSS intended to use these documents to prove to the jury that the manufacturing process at issue in the litigation was not unique, and was not considered to be a valuable asset by TydenBrooks's own board members. Additionally, CSS sought to show the jury that when assessing the value of a potential acquisition, the TydenBrooks board members did not once reference a valuable, secret, or confidential manufacturing process. (A.418-45.)

During trial, the District Court precluded CSS from introducing the deposition testimony of several of TydenBrooks's directors, including Mr. Morton,[25] holding that "[t]his is at least the 30,000 foot view. These guys are not engineers. It [] absolutely has no probative value in this case[.]" (A.876.) Because Mr. Morton was the only fact witness on both documents and the only witness capable of authenticating these documents, the preclusion of Mr. Morton's testimony meant the preclusion of these two critical documents that directly contradicted TydenBrooks's assertions that the manufacturing process employed by Stoffel was unique and competitively valuable. Mr. Morton's position as a TydenBrooks board member assessing the acquisition of a competing plastic

---

[25] Although TydenBrooks had indicated on its witness list that Mr. Morton would be testifying live at the trial, TydenBrooks strategically determined not to call Mr. Morton. Mr. Morton was outside of the subpoena power of the District Court and CSS had to rely on Mr. Morton's deposition testimony.

security seals manufacturer provides him with unique knowledge about the value of the manufacturing processes being acquired, knowledge that engineers would not possess. These documents are not technical documents, and the director assessing a potential acquisition is by far the best witness to testify concerning the business value of the acquired company. The exclusion of this critical evidence had a material effect on the jury's verdict, and was an abuse of discretion.

### 4. "Tiger Team" Emails

During trial, CSS intended to introduce several documents -- many of which were sent between TydenBrooks directors and officers -- that proved that TydenBrooks viewed CSS as a competitor, not a misappropriator, and that TydenBrooks's manufacturing process was in need of improvements to be able to effectively compete with CSS, and thus was of little to no competitive value. Three documents -- the "Tiger Team" emails -- were sent by John-Paul Ho, a TydenBrooks board member and director, discussing TydenBrooks's need to engage "plastics expert[s]" to form a "Tiger Team" and spend several weeks to "improve the plastic production process" at issue in this litigation. (A.582-88, A.627-28.) One of the Tiger Team emails explicitly references the need to improve the manufacturing process to "respond appropriately to threat from [CSS]." (A.585.) Another document -- the "Competitive Situation" document -- consists of an internal TydenBrooks PowerPoint presentation relating to its

security seals business line.  (A.589-613.)  The Competitive Situation document includes an entire slide entitled "Competitive Situation -- Cambridge," which discusses in detail the *competitive* threat posed by CSS, and fails to mention even once any misappropriation of any secret or confidential information, nor does it reference CSS's manufacturing process.  (A.611.)  CSS intended to use these documents to show the jury that TydenBrooks manufacturing process was ineffective and not competitively valuable.  CSS also intended to show that TydenBrooks never once referenced a secret or confidential manufacturing process during its discussions about its own manufacturing or CSS's manufacturing capabilities.

Prior to trial, TydenBrooks brought several motions *in limine* to exclude all evidence regarding TydenBrooks's struggles to close domestic manufacturing facilities, execute massive layoffs, and transfer manufacturing abroad to offshore factories, and the ensuing operational problems caused by this consolidation and integration plan.  By order dated March 18, 2015, the District Court granted TydenBrooks's motions, holding that all such documents were irrelevant and/or prejudicial because they referenced TydenBrooks's widespread operational problems.  (SPA.8-19.)  TydenBrooks was obligated to establish that its manufacturing process gave it "an opportunity to obtain an advantage over competitors who do not know or use it" (A.916), and was obligated to prove that it

52

was of value "to TydenBrooks and its competitors" (A.917), and yet the District

Court expressly held that "this evidence is irrelevant with respect to trade secrets."

(SPA.13.)  The District Court erroneously held that because TydenBrooks was not

seeking damages for the loss of customers, evidence that proved that

TydenBrooks's manufacturing process had no competitive value was irrelevant.

(SPA.15.)  By order dated April 17, 2015,[26] the District Court compounded its

erroneous ruling by excluding the three "Tiger Team" emails because they

referenced TydenBrooks's operational problems and thus were unfairly prejudicial,

citing its March 18 order as well as Rule 403.  (SPA.23-27.)  The District Court

also excluded the "Competitive Situation" document for being "*[p]rimarily

relate[d] to TydenBrooks'[s] operational problems*," again citing its March 18

order.  (SPA.25.)  The District Court did not permit argument on either

TydenBrooks's original motion *in limine* or prior to issuing its April 17 order.  By

looking exclusively at TydenBrooks's theory of damages, and ignoring the

necessary elements of a trade secret claim, the District Court erroneously excluded

---

[26] The April 17 order was necessitated because TydenBrooks's motions *in limine* failed to identify which documents were covered by each motion, instead identifying a handful of documents as examples of the types of materials it wished to exclude.  TydenBrooks brought a second motion seeking clarification from the District Court concerning specific documents it believed were covered by the prior orders, resulting in the April 17 order.

CSS's probative evidence that directly undercut TydenBrooks's trade secret claim. This was plain error, and an abuse of discretion.

The exclusion of these "Tiger Team" emails permitted TydenBrooks to present the jury with the false picture that its manufacturing process was top-of-the-line and employed the very best technology, when in reality the process was in need of major improvements and a dedicated "Tiger Team" -- complete with several "plastics expert[s]" -- to fix its systemic defects. The documents reflect that improvements were needed to "efficiency and quality and output and yield" and "lower scrap rate" and "marking" -- essentially each measurement of effective manufacturing. (A.582-83, A.627-28.) Also, the District Court's preclusion of these documents permitted TydenBrooks to cast itself as the victim of CSS's theft without having to address the reality that TydenBrooks's board members and officers viewed CSS first and foremost as a "competitive situation" and not as a wrongdoer a mere two months before commencing this lawsuit against CSS. (A.611.)

CSS was entitled to present the jury with TydenBrooks's own business records and statements of its board members and officers that reflected the true assessment of its manufacturing process and its lack of any competitive value. The exclusion of this critical evidence had a material effect on the jury's verdict, and was an abuse of discretion.

### 5.    Cross-Examination on Damages

During trial, CSS attempted to introduce evidence that TydenBrooks's lost

profits were minimal, and that any royalties on its technology would have resulted

in *de minimis* damages, far less than TydenBrooks's speculative "avoided

development costs" damages calculation.  CSS intended to vigorously cross-

examine TydenBrooks's damages expert, Dr. Vigil, on the availability of other

measures of damages beyond avoided development costs, measures of damages

that Dr. Vigil had evaluated but refused to include in his damages calculation.

(A.516, A.532-51.)  CSS intended to question Dr. Vigil about how much

TydenBrooks had lost in sales (almost nothing), the value of a reasonable royalty

for use of TydenBrooks's technology (thousands of dollars rather than the tens of

millions of dollars in damages TydenBrooks was seeking as avoided costs), and the

amount of CSS's profits (little to nothing), using Dr. Vigil's own expert report as

impeachment if necessary.  (*Id*.)

The District Court sustained objections to any questioning that would elicit

testimony speaking to any other measure of damages, repeatedly stating that the

only measure of damages applicable in the case was CSS's avoided development

costs, and that every other potential measure of damages was therefore irrelevant.

(A.751, A.753, A.823-34.)  However, it is a fundamental principle of law that a

party is entitled to vigorously cross-examine experts on their opinions, and the

55

District Court's refusal to permit CSS to cross-examine Dr. Vigil as to his methodology for calculating damages was reversible error. *See Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 596, (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Wiseman v. Sinclair Ref. Co.,* 290 F.2d 818, 819-20 (2d Cir. 1961) (finding reversible error where court limited cross-examination of expert witness "especially in view of the importance of the [expert's] testimony") (*citing Reilly v. Pinkus*, 338 U.S. 269, 275 (1949)).

By focusing exclusively on TydenBrooks's chosen measure of damages, the District Court's rulings prevented CSS from challenging the credibility of Dr. Vigil's testimony concerning avoided development costs and prevented CSS from putting on an effective defense, confining CSS exclusively to challenging the underlying metrics used in the calculation but not the avoided costs metric itself. This took away CSS's ability to prove to the jury that the avoided development costs put forward by TydenBrooks were inflated when compared to other, more accurate measurements of potential losses, and gave the jury the false impression that there was no other permissible way to calculate damages. CSS's defense theory was thus forced into the confines of TydenBrooks's damages theory, rather than being permitted to introduce to the jury alternative measures of damages that

were more reliable, less speculative, and resulted in far smaller amounts of

damages.  This was reversible error.

### B.   The District Court Abused Its Discretion by Excluding Evidence That TydenBrooks's Manufacturing Process Was Not a Secret

TydenBrooks was also obligated to prove that its manufacturing process for

plastic security seals was a secret; "[m]atters of public knowledge or of general

knowledge in an industry cannot be appropriated by one as his secret."  *Speedry*

*Chem. Prods., Inc. v. Carter's Ink Co.*, 306 F.2d 328, 331 (2d Cir. 1962).  The

combination of publicly available parts and information is not a protectable trade

secret where "there was nothing unique or secret in the combination[.]"  *Julie*

*Research Labs., Inc. v. Select Photographic Eng'g, Inc.*, 998 F.2d 65, 66 (2d Cir.

1993); *Imperial Chem. Indus. Ltd. v. National Distillers & Chem. Corp.*, 342 F.2d

737, 742 (2d Cir. 1965).  The jury was charged that "[t]he term secret [means]

substantial exclusivity of knowledge of the formula, process, device, or

compilation of information" (A.916), and was instructed to evaluate "the extent to

which the information is known outside TydenBrooks" (*Id.*).  CSS was prepared to

introduce several pieces of evidence that established that TydenBrooks's

manufacturing process was not a secret, and in fact was common throughout the

plastics manufacturing industry, including dozens of nearly identical plastic

security seals produced by competitors.  However, the District Court precluded all

such evidence prior to trial through a series of decisions on TydenBrooks's

57

motions *in limine*, ruling that only TydenBrooks's manufacturing process was relevant and everything else was of no probative value. (SPA.4-7, SPA.20-22.)

The effect of the District Court's decisions was to permit TydenBrooks to present a false dichotomy to the jury, in which there were but two manufacturers of these specific security seals: TydenBrooks and CSS. The only plastic security seals the jury was permitted to see were from TydenBrooks and CSS; the only manufacturing processes the jury was permitted to evaluate were TydenBrooks's and CSS's. These rulings cloaked TydenBrooks's manufacturing process -- which was nothing more than placing standard plastics manufacturing equipment next to each other in an automated line[27] -- in a veil of secrecy, with CSS as the necessary evildoer that stole this secret. These rulings were an abuse of discretion, substantially impacted CSS's right to put forward its defense to TydenBrooks's trade secret claim, and affected the jury's verdict that CSS was liable for trade secret misappropriation.

### 1.     Third-Party Security Seals

During trial, CSS intended to introduce approximately four dozen plastic security seals from competitor plastic security seals manufacturers, together with snapshots from competitors' publicly-available websites that included detailed

---

[27] This Circuit has expressly denied trade secret protection to ideas that are not unique or novel, disclaiming any trade secret protection for "an idea alone" as a compilation trade secret. *Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173, 1177-79 (2d Cir. 1993).

specification sheets that disclose the length, width, strength, composition, packaging, manufacturing, and other information concerning the seals (the "Third-Party Seals"). (*See, e.g.*, A.245-55.) CSS would have used this evidence to establish that key features of TydenBrooks's seals are matters of public knowledge, are generally known in the industry, and in fact, numerous market competitors produce virtually identical products.

Prior to trial, TydenBrooks brought a motion *in limine* to preclude CSS from introducing the Third-Party Seals, including the physical seals and information obtained from websites describing the seals. TydenBrooks's motion was a thinly disguised attempt to preclude evidence that a plastic security seal is simple to make, and to allow TydenBrooks to present the jury with a false dichotomy in which the jury saw only two seals that appeared virtually identical and not the four dozen other seals that were also virtually identical. The District Court granted this motion on April 15, 2015, without explanation or opinion. (SPA.20-22.) This was an abuse of discretion.

The Third Party Seals were critical to establishing CSS's defense that TydenBrooks's manufacturing process for security seals did not give it a competitive advantage and was "nothing unique or secret," precluding TydenBrooks from establishing the existence of a trade secret. *Julie Research Labs., Inc.*, 998 F.2d at 66. However, CSS was deprived of presenting its defense

that key features of TydenBrooks's seals are publicly known, and that the manufacturing process for similar security seals is publicly disclosed online.  Also, CSS lost the opportunity to fully cross-examine TydenBrooks's expert, Dr. William Howard, who "didn't consider it relevant … whether other manufacturing companies make [] seals the same way" as TydenBrooks or CSS.  (A.793.)  The Third Party Seals are probative of both the lack of any purported secret processes necessary to make a claim involving trade secrets, as well as the competitive value of any manufacturing process, secret or not, in light of the high level of competition from nearly-identical seals sold in the market.  The District Court's ruling that the Third-Party Seals were not relevant to CSS's defense against TydenBrooks's claims was reversible error and an abuse of discretion.

The preclusion of the Third-Party Seals also generated juror confusion.  By granting TydenBrooks's motion to exclude the Third-Party Seals, the District Court permitted TydenBrooks to introduce evidence comparing physical aspects of the parties' seals, but refused to permit any evidence comparing the physical aspects of third-party manufacturers' seals.  Throughout the trial, TydenBrooks focused not only on manufacturing processes, but also the external similarities between the security seals manufactured by itself and CSS, first prominently displaying the physical similarities between its security seals and CSS's seals during opening statements, and then referencing the similarities throughout the

60

trial.[28]  (A.655-58, A.700-01.)  For example, TydenBrooks's expert, Dr. James

Kirk, testified that CSS "copied the features that were being used by TydenBrooks

to produce [its] seals," premising his opinion on a visual comparison of the parties'

seals, without comparison to any third-party seal.  (A.700 ["I compared the

physical products [of CSS and TydenBrooks];" "my conclusion [was] based on

looking at the features"].)  Dr. Kirk also testified that he concluded CSS's line of

truck seals was "almost an exact copy of the TydenBrooks line" in large part based

upon similar physical measurements between the parties' seals.  (A.700.)  Such

evidence was introduced to create an impression with the jury that physically

similar seals were an anomaly in the marketplace, that CSS somehow possessed

information that does not exist in the public domain, and that CSS therefore must

have misappropriated TydenBrooks's valuable commercial secret.  To the extent

that the physical similarities between seals was so irrelevant to the manufacturing

process that CSS was precluded from introducing virtually identical seals from

other manufacturers, TydenBrooks should have similarly been precluded from

emphasizing the similarities between its own seals and CSS's seals.

The District Court fully accommodated TydenBrooks's comparison of the

superficial appearance of the parties' seals, even allowing the jury to hold sample

---

[28] TydenBrooks's damages expert, Dr. Vigil, similarly based his conclusions
concerning the appropriation measure of damages in part on the "Similarity of
CSS'[s] Products to TydenBrooks'[s] Products."  (A.541-42.)

seals from each party during TydenBrooks's direct case. (A.700.) TydenBrooks also was permitted to use prominent demonstratives for the purpose of emphasizing the similar physical appearance and technical specifications of the parties' seals, with no comparison to any third-party seal as a control group. (A.705-14.) Because CSS was precluded from introducing the Third-Party Seals -- despite readily-discernible images with *de minimis* potential for juror confusion -- TydenBrooks's repeated and un-rebutted use of visually impactful demonstratives was undoubtedly some of its most dramatic evidence. Such a ruling is not harmless, and is grounds for a new trial. *U.S. v. Curley*, 639 F.3d 50, 62-63 (2d Cir. 2011) (granting new trial where the Court could not say with fair assurance that "dramatic evidence" resulting from erroneous evidentiary ruling did not factor into the jury's decision).

CSS was entitled to present the jury with evidence concerning how many virtually identical security seals were available on the market, and to defeat the false impression created by TydenBrooks that the similarity between its and CSS's seals meant that CSS copied TydenBrooks's manufacturing process. The preclusion of the third-party security seals created substantial jury confusion as the noticeable absence of any evidence relating to third party seals would have likely suggested to the jury that no similar third party seals existed, resulting in improper weight being afforded to TydenBrooks's assertions of value and secrecy. The

exclusion of this critical evidence had a material effect on the jury's verdict, and was an abuse of discretion.

### 2. Robert Baker's Testimony

During trial, CSS sought to introduce certain deposition testimony from Robert Baker, TydenBrooks's former General Manager from 2006 to 2009 and Vice President of Operations from 2009 to 2012, that (i) manufacturing processes are not typically a "trade secret," (ii) he does not consider the manufacturing of plastic indicative seals a "trade secret," and (iii) he did not consider the manufacturing process employed by TydenBrooks to be a "secret process." (SPA.5.) Mr. Baker's testimony was rooted in his personal knowledge and experience working at TydenBrooks, including his work during the time that TydenBrooks acquired Stoffel. CSS would have used Mr. Baker's testimony to demonstrate to the jury that TydenBrooks's process for manufacturing plastic seals was not a confidential or "secret process."[29]

Prior to trial, TydenBrooks brought a motion *in limine* to exclude this testimony, which the District Court granted pursuant to Rule 701, holding that "Mr. Baker's testimony is an expert opinion because it relies on specialized knowledge" and finding that Mr. Baker lacked experience outside of TydenBrooks

---

[29] CSS similarly attempted to introduce testimony from Mr. Lundberg about whether TydenBrooks's manufacturing process was secret or confidential, and this information was similarly precluded by the District Court as being solely the province of an expert witness. (A852-53.)

or experience with trade secrets.  (SPA.6-7.)  Neither of these reasons supports the District Court's preclusion of CSS's critical evidence that directly undermined TydenBrooks's assertions that its manufacturing process was secret or confidential.

As already addressed in connection with the District Court's erroneous preclusion of Mr. Lundberg's testimony (*supra* at §IV.A.2), a witness's specialized knowledge does not preclude the witness from testifying, provided that the testimony was rooted in personal perception.  *Rigas*, 490 F.3d at 224; Fed. R. Evid. 701, Advisory Committee Notes (1972); *B & G Plastics*, 2004 WL 307276, *8-9; *Medforms*, 290 F.3d at 111; *Securitron*, 65 F.3d at 265 (2d Cir. 1995).  Mr. Baker's testimony stemmed from his experience and participation in plastics manufacturing at TydenBrooks both before and after the acquisition of Stoffel, and was not premised upon specialized training of any sort such as would be required of a scientific expert witness.  *Yannotti*, 541 F.3d at 126; *Cuti*, 720 F.3d at 460; *Lightfoot*, 110 F.3d at 911; *Ghavami*, 23 F. Supp. 3d at 171-72.  As such, Mr. Baker's testimony was improperly excluded under Rule 701.[30]

_____

[30] The District Court additionally took issue with Mr. Baker's use of the term "trade secret" given Mr. Baker's lack of legal experience.  However, the very fact that Mr. Baker was not aware that TydenBrooks considered its manufacturing process a "trade secret," regardless of what Mr. Baker understood that to be, is in itself telling.  *Thermodyne Food Serv. Products, Inc. v. McDonald's Corp.*, 940 F. Supp. 1300, 1305-06 (N.D. Ill. 1996) (allowing testimony of non-expert witnesses to testify as to their personal opinion whether technology was trade secret).  Further, Mr. Baker's opinion that TydenBrooks's process was not a "secret

The District Court also found that Mr. Baker "has no manufacturing experience outside TydenBrooks" and that he "lacks first-hand knowledge of TydenBrooks'[s] own manufacturing process." (SPA.6.) However, the District Court ignored that Mr. Baker offered the unique vantage point of comparing TydenBrooks's manufacturing processes with the manufacturing processes of the acquired competitors, including Stoffel. Mr. Baker, prior to working at TydenBrooks, worked for EJBrooks, *a chief competitor of TydenBrooks* (then d/b/a TydenBrammall). (A.258.) Mr. Baker testified that his responsibilities at EJBrooks included "[f]ull production . . . for the facility" where EJBrooks made "indicative seals" and "security seals," giving detail about the manufacturing process that was employed at EJBrooks. (A.258, A.260-61.) Mr. Baker worked at TydenBrooks after its acquisition of Stoffel, was "the primary U.S. coordinator of all integration" for TydenBrooks's acquisitions between 2009 and 2012 (with responsibilities including "movement of all the U.S. facilities, equipment, setting up the equipment"), viewed engineering drawings of TydenBrooks's machines "constantly," and observed the Stoffel manufacturing process in comparison to the EJBrooks manufacturing process. (A.866, A.258, A.272-73.) Mr. Baker's extensive experience was unique, and could not be replicated by any other witness.

---

process" requires no legal training and is an everyday perception for which the Court provided no grounds as to why it should qualify as "expert." (SPA.6.)

CSS was entitled to present the jury with Mr. Baker's testimony about TydenBrooks's manufacturing processes and its utter lack of secrecy. The exclusion of this critical evidence had a material effect on the jury's verdict, and was an abuse of discretion.

### C. The District Court Abused Its Discretion by Excluding Evidence Reflecting TydenBrooks's Malice Toward CSS as a Competitor

CSS intended to introduce at trial several pieces of evidence -- including documents and testimony -- that TydenBrooks brought its lawsuit not because of a meritorious concern that CSS had stolen any secret or confidential information, but rather to "destroy" or at least "slow down" an effective competitor with expensive litigation. CSS also intended to use this evidence to impeach one of TydenBrooks's key fact witnesses -- indeed, one of only two fact witnesses that TydenBrooks presented for trial -- as having a deep-seated and long-standing bias against CSS and its employees. Indeed, not a single one of these documents references TydenBrooks's manufacturing process while discussing a lawsuit against CSS, and is probative evidence that TydenBrooks was not concerned about its allegedly secret and valuable manufacturing information but only about "squashing" a new competitor. Read together with the intended testimony from CSS's fact witnesses and TydenBrooks's fact witnesses, CSS would have established that TydenBrooks suffered no damages as the result of any alleged misappropriation of secret or confidential information, but rather was suffering as a

66

result of honest competition from a superior company.  In addition to intending to use this evidence to establish its defense to TydenBrooks's claims, CSS also intended to use this evidence to establish its counterclaim that TydenBrooks brought sham litigation for anticompetitive purposes in violation of antitrust laws.

Prior to trial, TydenBrooks brought a motion *in limine* to "exclude evidence of subjective intent" until after the conclusion of the first phase of the trial on its claims, relegating all evidence of TydenBrooks's motives to a second phase of the trial on CSS's antitrust counterclaim.[31]  (SPA.1-2.)  By order dated March 5, 2015, the District Court granted TydenBrooks's motion, holding that TydenBrooks's intent in bringing its lawsuit against CSS was exclusively relevant in the context of CSS's counterclaim for TydenBrooks's antitrust violations.  By order dated April 17, 2015, the District Court expanded its March 5 order and excluded additional documents on the basis that any probative value was outweighed by the danger of unfair prejudice, or that the document included a reference to "TydenBrooks'[s] subjective intent in bring [its] trade secrets claim."  (SPA.23-27.)  Neither the March 5 order nor the April 17 order address the relevance of the subjective intent

---

[31] The District Court misapplied *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.* 508 U.S. 49 (1993), by transforming a two-step *definition* of litigation into a two-step *process* for the admissibility of evidence at trial, holding that "CSS must demonstrate that Tyden[B]rooks'[s] trade secrets claim is 'objectively baseless' *before it may introduce evidence regarding Tyden[B]rooks'[s] subjective intent* in making that claim." (emphasis added) (SPA.2-3.)

documents to CSS's defenses against TydenBrooks's claims, focusing exclusively on the relevance of the documents to CSS's counterclaim; CSS was not permitted the opportunity for argument prior to the District Court issuing these orders. During trial, the District Court repeatedly sustained objections from TydenBrooks to prevent CSS from referencing TydenBrooks or Mr. Mallozzi's intent, malice, or bias.

These orders were erroneous. The fact that TydenBrooks was pursuing its claims against CSS in bad faith is relevant, regardless of whether or not CSS had brought a counterclaim for antitrust violations. "*Proof of bias is almost always relevant* because the jury, as a finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness's testimony." *U.S. v. Abel*, 469 U.S. 45, 52 (1984) (emphasis added); *see also David v. Alaska*, 415 U.S. 308, 316 (1974) (defining the jury as the "sole judge of the credibility of a witness"). "A successful showing of bias on the part of a witness would have a tendency to make the facts to which he testified less probable in the eyes of the jury than it would be without such testimony." *Abel*, 469 U.S. at 51. "The partiality of a witness is subject to exploration at trial, and is *always relevant* as discrediting the witness and affecting the weight of his testimony." *Davis*, 415 U.S. at 316 (quotation and citation omitted) (emphasis added). The District Court never addressed CSS's right to

establish TydenBrooks's or Mr. Mallozzi's bias, in direct contravention of United States Supreme Court authority. CSS, by bringing its meritorious counterclaim, lost the ability to introduce any evidence that addressed TydenBrooks's or its employees' motives behind this lawsuit; indeed, there is *no other basis* upon which the District Court premised its March 5 order other than the existence of CSS's counterclaim. (SPA.2-3.)

The fact that TydenBrooks was pursuing its claims against CSS in bad faith is relevant, regardless of whether or not CSS had brought a counterclaim for antitrust violations. In Defendants' Exhibit 324 (A.629-30), Ralph Mallozzi, a TydenBrooks senior executive, expressly told two colleagues at TydenBrooks that he was "committed to finding a way to destroy" CSS. Not once did Mr. Mallozzi reference CSS's manufacturing process, or theft of any secret or confidential information from TydenBrooks. Mr. Mallozzi's concern did not stem from any concern that CSS had stolen any trade secrets, but rather because he did not want to face competition. Mr. Mallozzi, time and again, had expressed to his colleagues that he was personally upset and offended that Mr. Lyle, a former employee of TydenBrooks and, in Mr. Mallozzi's mind, a "protégé" of Mr. Mallozzi, left TydenBrooks to work for a competing company. (A.227-44, A.575-77, A.632-34, A.645-49.) Mr. Mallozzi was still "personally offended and pissed off" years later in 2012. CSS intended to use this document (1) to show that Mr. Mallozzi was

personally biased against CSS as a competitor (and not as a trade secret

misappropriator), and (2) to defend against Mr. Mallozzi's testimony that he had

no personal animus toward Mr. Lyle or CSS. (A.750.) This document was

precluded simply because it referred to TydenBrooks's subjective intent. (SPA.23-

27.)

Defendants' Exhibits 71, 76, 346, 491, and 497 (A.227-44, A.574-77,

A.631-35, A.644-49) contain an email string that begins with an email sent by Mr.

Mallozzi to TydenBrooks's senior management team -- including several members

of TydenBrooks's board of directors -- advising them that CSS was a problem that

needed to be "squash[ed]." Mr. Mallozzi admitted that CSS offered better prices,

better quality seals, and better delivery times, none of which TydenBrooks could

compete with, but that TydenBrooks nevertheless needed to take action to protect

its market share. Not once did Mr. Mallozzi reference CSS's manufacturing

process, or theft of any secret or confidential information from TydenBrooks. In

response to Mr. Mallozzi's email, a TydenBrooks director suggested four

competitive responses, including "[g]o after Cambridge for intellectual properties

[*sic*] and patent infringements to slow them down." (A.235.) Mr. Mallozzi latched

onto the possibility of a lawsuit against CSS and its former employees, not because

of any identifiable wrongdoing by CSS but because "[o]ur first and most impactful

strike with them will be legal action," and that a lawsuit "will create the most

70

disruption to the business internally, externally and individually." (A.632.) Mr. Mallozzi once again disclosed his deep-seated animus toward CSS and its employees by stating that he wanted to "punch[] them hard, in the face, with the legal action."[32] (A.632.) This entire email string reflects that the lawsuit against CSS was a business strategy against a competitor, rather than a mechanism to protect secret or confidential information. In Defendants' Exhibit 76, two TydenBrooks directors discuss how to "nip [CSS] in the bud" to protect itself in the market, going on to discuss how TydenBrooks's senior executives were "not capable of mounting a competitive response." (A.227.) The District Court also excluded Defendants' Exhibit 88, in which a TydenBrooks director emailed other TydenBrooks directors asking, "What is the status of initiative to go after Cambridge [] legally? . . . *They are hurting us in the market place*." (A.256 (emphasis added).) Each of these documents plainly reflects TydenBrooks's concern was not with protection of a valuable, secret, confidential process, but with the elimination of an effective competitor who was offering better products at better prices with better delivery times.

---

[32] One document that was excluded, Defendants' Exhibit 491, even referenced the possibility that TydenBrooks would acquire CSS to eliminate a competitive threat, rather than sue CSS. (A.644-49.) The District Court ruled that this email was unfairly prejudicial pursuant to Rule 403. (SPA.26.)

The District Court's tunnel vision regarding these documents exclusively in the context of CSS's counterclaim is perhaps the clearest when looking at Defendants' Exhibit 497, which includes the exact same discussion concerning CSS as a competitive threat and the possibility of suing CSS to "slow them down." (A.235.)  This document includes at the very beginning of the email chain information about the cost of TydenBrooks's manufacturing equipment.  (A.242-43.)  This is directly relevant to CSS's defense against TydenBrooks's damages calculation in that it shows that TydenBrooks's damages expert was using extraordinarily inflated values for TydenBrooks's manufacturing equipment. However, because this email also touches upon TydenBrooks's subjective intent and thus was relevant to CSS's counterclaim, this document was precluded by the District Court.

TydenBrooks's malice toward CSS should not have been precluded simply because it was also relevant to CSS's antitrust counterclaim.[33]  TydenBrooks should not have been permitted to wash away its embarrassing and harmful admissions that CSS was successfully competing against it, and shield its key fact witness from impeachment that he had been on the war path for years against his

---

[33] Although the District Court did permit admission of two documents (A.622-26), these documents substantially predated CSS's formation or manufacture of security seals, did not address the lawsuit against CSS at all, and did not speak to TydenBrooks's malicious intent to "destroy" CSS with a lawsuit.

"former protégé" and the new company he worked for. The jury never heard anything to contradict TydenBrooks's assertion that this lawsuit was to rectify CSS's supposed theft of secret and confidential information. In effect, the District Court's tunnel vision on CSS's counterclaim and erroneous exclusion of these documents gave the jury the false impression that TydenBrooks filed this lawsuit after it uncovered that CSS had stolen its manufacturing process, and not after it had determined that it was unable to compete with CSS. CSS was entitled to present the jury with evidence reflecting TydenBrooks's motivation to sue CSS as its top competitor, and to impeach Mr. Mallozzi with his overt and unrelenting malice toward CSS and its employees. The exclusion of this critical evidence had a material effect on the jury's verdict, and was an abuse of discretion.

## V.    CSS's Antitrust Counterclaim Should Be Reinstated

At the close of TydenBrooks's presentation of evidence, and having excluding the evidence discussed above, the District Court dismissed CSS's counterclaim for antitrust violations under Section 2 of the Sherman Act (15 U.S.C. § 2), which was premised upon TydenBrooks filing a sham lawsuit. (A.856-57.)

However, if CSS had been permitted to present evidence that TydenBrooks's manufacturing processes had zero value, were not unique, were exactly the same as those used by its competitors, had systemic flaws, produced seals that were no

better than its competitors, and TydenBrooks filed claims against defendants because Mr. Mallozzi wanted to punch them hard in the face with a legal action to slow them down, the jury could easily have concluded that this lawsuit was objectively baseless and filed in bad faith. Accordingly, if the Court reverses and remands for a new trial, the Court should reverse the dismissal of CSS's counterclaim.

## **CONCLUSION**

For the foregoing reasons, this Court should reverse the District Court's

Judgment and enter judgment in favor of CSS or, in the alternative, remand for a

new trial and grant such other relief as this Court deems just and proper.

Dated: New York, New York       Respectfully submitted,
        April 21, 2016


By:   */s/ Howard W. Schub*    
Daniel J. Fetterman
(dfetterman@kasowitz.com)
Howard W. Schub
(hschub@kasowitz.com)

KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700
Fax: (212) 506-1800

*Attorneys for Cambridge Security Seals*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(A)</u>

1.      This memorandum of law complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and the Order of this Court dated April 20, 2016 [Dkt. No. 53], because this brief contains 17,738 words according to Microsoft Word 2013, the word-processing software used to prepare this memorandum of law.

2.      The number of words set forth in the foregoing paragraph excludes the parts of this memorandum of law that Fed. R. App. P. 32(a)(7)(B)(iii) exempts from the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).

3.      This memorandum of law complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in Times New Roman 14-point font.

Dated:  April 21, 2016

    */s/ Howard W. Schub*    
    Howard W. Schub

# Special Appendix

i

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

**Page**

Order of the Honorable Loretta A. Preska, dated
    March 5, 2015, Appealed From ............................ SPA-1

Order of the Honorable Loretta A. Preska, dated
    March 11, 2015, Appealed From .......................... SPA-4

Order of the Honorable Loretta A. Preska, dated
    March 18, 2015, Appealed From .......................... SPA-8

Order of the Honorable Loretta A. Preska, dated
    April 15, 2015, Appealed From ........................... SPA-20

Order of the Honorable Loretta A. Preska, dated
    April 17, 2015, Appealed From ........................... SPA-23

Judgment, dated May 13, 2015, Appealed From ....... SPA-28

Memorandum and Order of the Honorable Loretta
    A. Preska, dated December 23, 2015 and filed
    December 28, 2015, Appealed From .................... SPA-30

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
                                   :
E.J. BROOKS COMPANY d/b/a          :
TYDENBROOKS,                       :
                                   :        12 Civ. 2937 (LAP)
            Plaintiff,             :
                                   :        ORDER
       v.                          :
                                   :
CAMBRIDGE SECURITY SEALS,          :
et al.,                            :
                                   :
            Defendants.            :
                                   :
------------------------------X

LORETTA A. PRESKA, Chief United States District Judge:

          E.J. Brooks Company d/b/a Tydenbrooks ("Tydenbrooks")

brings this action alleging, among other claims, that Cambridge

Security Seals, et al. ("CSS") stole trade secrets from

Tydenbrooks.  (See Amended Complaint, dated Feb. 21, 2013 [dkt.

no. 104].)  CSS responded by Answer, and asserted a counterclaim

therein (the "Counterclaim").  (See Answer, dated Nov. 21, 2013

[dkt. no. 117].)  The Counterclaim alleges that Tydenbrooks'

trade secrets suit constitutes tortious interference with a

prospective contract, i.e., CSS makes an antitrust-based

counterclaim of "sham" litigation.  Id.  In anticipation of

trial, Tydenbrooks made seven motions in limine.  (Notice of

Plaintiff's Motions in limine, dated Jan. 29, 2015 [dkt. no.

217].)  Among them is a motion to "exclude evidence of

subjective intent until necessary and to bifurcate trial proceedings" ("MIL for Bifurcation"). (Id.)  The matter is now fully briefed,[1] and the Court GRANTS Tydenbrooks' MIL for Bifurcation for the following reasons.

In Prof'l Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49 (2014), the Supreme Court held that "[l]itigation cannot be deprived of immunity as a sham unless it is objectively baseless." Id. at 49.  The Court set out a two-part definition for litigation to constitute a "sham." First, the litigation must be "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." Id. at 50.  Second, and only once the first prong is met, the litigation must conceal "an attempt to interfere directly" with a competitor's business relationship(s) by using litigation as an "anticompetitive weapon." Id.  By extension, "evidence of anticompetitive intent cannot transform otherwise legitimate activity into a sham." Id. at 59.

Here, CSS must demonstrate that Tydenbrooks' trade secrets claim is "objectively baseless" before it may introduce

---

[1] See Mem. of Law in Support of Pl.'s Motion in limine to Exclude Evidence of Subjective Intent until Necessary and to Bifurcate Trial Proceedings, dated Feb. 17, 2015 [dkt. no. 248]; CSS's Mem. of Law in Opp'n to Tydenbrooks's Motions in limine to Exclude: (I) Evidence of Subjective Intent and to Bifurcate the Trial ..., dated Feb. 18, 2015 [dkt. no. 259]; Pl.'s Reply Mem. of Law in Further Support of its Motions in limine to Bifurcate the Trial and Exclude Evidence of: Subjective Intent ..., dated Mar. 3, 2015 [dkt. no. 276].

evidence regarding Tydenbrooks' subjective intent in making that claim.  Even if Tydenbrooks' trade secrets claim were motivated by anticompetitive intent, that suit could still be objectively meritorious; and the latter determination must be made without regard to the former.  Put differently: if CSS cannot demonstrate that Tydenbrooks' trade secrets claim is "objectively baseless," CSS's Counterclaim is moot.  Courts routinely bifurcate trade secrets claims from antitrust counterclaims for this very reason.  See, e.g., In re Innotron Diagnostics, 800 F.2d 1077, 1084 (Fed. Cir. 1986) ("The district court noted cases reflecting the now-standard practice of separating for trial patent issues and those raised in an antitrust counterclaim.").

Therefore, in keeping with Supreme Court precedent and in the interest of judicial economy, Tydenbrooks' MIL for Bifurcation [dkt. no. 217] is GRANTED.  The Court does not decide the remaining motions in limine here.

SO ORDERED.

Dated:    New York, New York
          March 5, 2015

                                  _____
                                  LORETTA A. PRESKA
                                  Chief United States District Judge

3

SPA-4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X
                               :
E.J. BROOKS COMPANY d/b/a      :
TYDENBROOKS,                   :        12 Civ. 2937 (LAP)
                               :
              Plaintiff,       :        ORDER
                               :
       v.                      :
                               :
CAMBRIDGE SECURITY SEALS,      :
et al.,                        :
                               :
                               :
              Defendants.      :
                               :
-------------------------------X

LORETTA A. PRESKA, Chief United States District Judge:

         E.J. Brooks Company d/b/a TydenBrooks ("TydenBrooks")

brings this action alleging, among other claims, that Cambridge

Security Seals, et al. ("CSS") stole trade secrets from

TydenBrooks.  (See Amended Complaint, dated Oct. 23, 2013 [dkt.

no. 104].)  CSS responded by Answer, and asserted a counterclaim

therein (the "Counterclaim").  (See Answer, dated Nov. 21, 2013

[dkt. no. 117].)  The Counterclaim alleges that TydenBrooks'

trade secrets suit constitutes tortious interference with a

prospective contract, i.e., CSS makes an antitrust-based

counterclaim of "sham" litigation.  Id.  In anticipation of

trial, Tydenbrooks made seven motions in limine.  (Notice of

Plaintiff's Motions in limine, dated Jan. 29, 2015 [dkt. no.

217].)  Among them is a motion to exclude certain testimony

1

given by Robert J. Baker ("MIL to Exclude Baker's Testimony"), a former TydenBrooks employee. The matter is now fully briefed,[1] and the Court GRANTS TydenBrooks' MIL to Exclude Baker's Testimony, as to the specific testimony challenged, for the following reasons.

Mr. Baker served as a general manager of TydenBrooks from 2006 to 2009, and as the Vice-President of Operations from 2009 until his resignation in 2012. Based upon that experience, CSS seeks to introduce the following testimony from Mr. Baker:

> Q:  Are manufacturing processes typically a *trade secret?*
> A:  No.
> Q:  Do you consider the manufacturing process of plastic indicative seals a *trade secret*?
> A:  No.
>          ...
> Q:  Did you consider the manufacturing process employed in Tallapoosa a *trade secret*?
>          [Objection.]
> Q:  A secret process?
> A:  No.  I would not.

(Decl. of Daniel B. Goldman, dated Feb. 17, 2015 [dkt. no. 245], Ex. A ("Baker Deposition Tr."), at 68:12-17; and 70:12-16, respectively.)

---

[1] See Mem. of Law in Support of Pl.'s Motion in limine to Exclude Improper Lay Opinion Testimony from Robert J. Baker, dated Feb. 17, 2015 [dkt. no. 244]; CSS's Mem. of Law in Opp'n to TydenBrooks's Motions in limine to Exclude: (I) Evidence of Subjective Intent and to Bifurcate the Trial ..., dated Feb. 18, 2015 [dkt. no. 259]; Pl.'s Reply Mem. of Law in Further Support of its Motions in limine to ... Exclude Evidence of: Improper Lay Opinion Testimony ..., dated Mar. 3, 2015 [dkt. no. 276].

SPA-6

Fed. R. Evid. ("Rule") 701 provides that testimony cannot be received as lay opinion if it is based on "scientific, technical, or other specialized knowledge ...." See Rule 701(c). Whereas "a lay opinion must be the product of reasoning processes familiar to the average person in everyday life ... expert testimony results from a process of reasoning which can be mastered only by specialists in the field." United States v. Garcia, 413 F.3d 201, 215 (2d Cir. 2005) (citing Rule 701(c) advisory committee notes to 2000 amendments) (internal quotation marks omitted).

Mr. Baker's testimony is an expert opinion because it relies on specialized knowledge, not only of the broad range of manufacturing processes for seals, but also about trade secrets. As to the former, Mr. Baker has no manufacturing experience outside TydenBrooks (Baker Deposition Tr., at 7:14-10:10; 16:11-21); moreover, he admittedly lacks first-hand knowledge of TydenBrooks' own manufacturing process (id. at 19:23-25; 175:8-12). Mr. Baker has even less experience with "trade secrets," as evidenced by his deposition testimony:

        Q:   Do you know what a trade secret is?
        A:   Yes.
        Q:   What do you believe it is?
        A:   If you're referring to a patent infringement, you
             can reverse any product that would not infringe
             on a patent ....

SPA-7

(Id. at 65:19-22).  Accordingly, Mr. Baker's lay opinions regarding the manufacturing process for seals and whether, generally or with respect to TydenBrooks' process specifically, that process constitutes a "trade secret," is inadmissible.

CONCLUSION

Therefore, TydenBrooks' MIL to Exclude Baker's Testimony [dkt. no. 217] is GRANTED as to the testimony quoted herein.  (Baker Deposition Tr., at 68:12-17; 70:12-16.)  Mr. Baker may, of course, testify as to factual observations, including any steps taken to keep the seal manufacturing process secret.  The Court does not decide the remaining motions in limine here.

SO ORDERED.

Dated:      New York, New York
            March 11, 2015

                                    _____
                                    LORETTA A. PRESKA
                                    Chief United States District Judge

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X

E.J. BROOKS COMPANY d/b/a       :
TYDENBROOKS,                    :
                                :          12 Civ. 2937 (LAP)
                Plaintiff,      :
                                :          ORDER
      v.                        :
                                :
CAMBRIDGE SECURITY SEALS,       :
et al.,                         :
                                :
                                :
                Defendants.     :
                                :
------------------------------X

LORETTA A. PRESKA, Chief United States District Judge:

        E.J. Brooks Company d/b/a TydenBrooks ("TydenBrooks")
brings this action alleging, among other claims, that Cambridge
Security Seals, et al. ("CSS") stole trade secrets from
TydenBrooks.  (See Amended Complaint, dated Oct. 23, 2013 [dkt.
no. 104].)  CSS responded by Answer, and asserted a counterclaim
therein (the "Counterclaim").  (See Answer, dated Nov. 21, 2013
[dkt. no. 117].)  The Counterclaim alleges that TydenBrooks'
trade secrets suit constitutes tortious interference with a
prospective contract, i.e., CSS makes an antitrust-based
counterclaim of "sham" litigation.  Id.

        In anticipation of trial, Tydenbrooks made seven
motions in limine.  (Notice of Plaintiff's Motions in limine,
dated Jan. 29, 2015 [dkt. no. 217].)  Among them are motions to

1

SPA-9

exclude evidence regarding TydenBrooks' reductions in force or offshoring ("MIL to Exclude Reductions in Force or Offshoring") and TydenBrooks' operational problems ("MIL to Exclude Operational Problems").  Although the two motions in limine are distinct,[1] both CSS' opposition[2] and TydenBrooks' reply[3] address them together and refer to the evidence sought to be excluded in the two motions as "the Consolidation Evidence."  The Court does the same, and GRANTS both TydenBrooks' MIL to Exclude Reductions in Force or Offshoring and MIL to Exclude Operational Problems for the reasons below.

---

[1] See Mem. of Law in Support of Pl.'s Motion in limine to Exclude Evidence Regarding TydenBrooks' Reductions in Force or Offshoring, dated Feb. 17, 2015 [dkt. no. 251] ("Pl.'s Mem. to Exclude Reductions-Offshoring"); Mem. of Law in Support of Pl.'s Motion in limine to Exclude Evidence of Plaintiff's Operational Problems, dated Feb. 17, 2015 [dkt. no. 253] ("Pl.'s Mem. to Exclude Operational Problems").

[2] See CSS'S Mem. of Law in Opp'n to TydenBrooks' Motions in limine ..., dated Feb. 18, 2015 [dkt. no. 259] ("Omnibus Opp'n"), at 44-55.

[3] See Pl.'s Reply Mem. of Law in Further Support of its Motions in limine ..., dated Mar. 3, 2015 [dkt. no. 276] ("Omnibus Reply"), at 16-20.

SPA-10

I.    LEGAL STANDARD

Evidence must be relevant in order to be admissible. See Fed. R. Evid. ("Rule") 402.  Relevant evidence is defined as evidence that "has any tendency to make a fact more or less probable than it would be without the evidence; and ... the fact is of consequence in determining the action."  Id. Rule 401. However, relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Id. Rule 403.  "Unfair prejudice" means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  Id., Advisory Committee Notes.

II.   DISCUSSION

In its MIL to Exclude Reduction in Force or Offshoring, TydenBrooks seeks to exclude evidence of the newly-combined company's decisions regarding reductions in force, closing of domestic manufacturing facilities and opening of manufacturing facilities in China and Mexico.  Testimony on these topics included that hundreds of employees were laid off from the domestic plants that were closed and that morale was low in the domestic facilities.  (See Pl.'s Mem. to Exclude Reductions-Offshoring at 2-3).  Documents proffered by CSS reference plans to consolidate domestic facilities, reduce the size of the domestic workforce, and move operations overseas. (See id. at 4.)

In its MIL to Exclude Operational Problems, TydenBrooks seeks to exclude evidence that, as a result of the less-than-optimal consolidation of TydenBrooks' manufacturing operations, it encountered various operational problems.  The evidence proffered by CSS includes customer complaints about long lead times and substandard quality and internal documents discussing those operational problems.  (See Pl.'s Mem. to Exclude Operational Problems at 2-3.)

CSS advances several arguments in support of its contention that the Consolidation Evidence is relevant and admissible.  (See Omnibus Opp'n at 44-55.)  Each of these bases

4

for admission fails because the evidence at issue is irrelevant, fails Rule 403's balancing test as unduly prejudicial, or both. The Court addresses each of CSS' arguments in turn, before also concluding that—even if relevant—the Consolidation Evidence is unduly prejudicial.

A. The Consolidation Evidence Lacks Probative Value

1. Loss of Customers

TydenBrooks is not claiming damages from the loss of customers (see Pl.'s Mem. to Exclude Reductions-Offshoring at 6 n.1);[4] rather, TydenBrooks' theory of damages is based on the idea that, by stealing TydenBrooks' trade secrets, CSS was able to avoid development costs in producing plastic indicative security seals. This "avoided development costs" theory is supported by TydenBrooks' expert witness on damages, Dr. Vigil. (See Omnibus Opp'n at 47.) Accordingly, evidence that any lost profits TydenBrooks suffered as a result of losing customers to CSS were due to its less-than-optimal consolidation and not to CSS' alleged misappropriation is irrelevant. However, by the same token, the deadline for expert discovery has passed, and Dr. Vigil may not amend his report to claim damages from the loss of customers. Put differently: evidence of lost customers

_____

[4] See also Pl.'s Mem. to Exclude Operational Problems at 6 ("... [TydenBrooks] is not seeking to recover its own lost profits from [CSS].").

SPA-13

is irrelevant because of TydenBrooks' theory of damages, but TydenBrooks may not amend that theory.

### 2. Anticompetitive Motivation, Monopoly Power, and Market Share

CSS argues that the Consolidation Evidence demonstrates that TydenBrooks acted in bad faith in commencing this action, that it knew it had not been damaged by CSS' alleged misappropriation, that it filed the action "to slow [CSS] down," and that it used its monopoly power to injure customers.  (See Omnibus Opp'n at 47-48.)

Each of these grounds for admissibility relates to CSS' Counterclaim and is therefore not relevant in the trade secrets context.  This Court explicitly granted TydenBrooks' motion in limine to "exclude evidence of subjective intent until necessary and to bifurcate trial proceedings."  (See Order, dated Mar. 5, 2015 [dkt. no. 278] ("Bifurcation Order")) Accordingly, CSS must demonstrate that TydenBrooks' trade secrets claim is "objectively baseless" before it may introduce evidence regarding TydenBrooks' subjective intent—such as anticompetitive motivation, monopoly power, or market share—in making that claim.  (Id. at 2-3.)  The Court notes that, although this evidence is irrelevant with respect to trade secrets, it may be relevant to CSS' Counterclaim; the Court does not rule on the latter issue now.

6

3. Secret Process

CSS argues that prior to TydenBrooks' acquisition of other seal manufacturers, those firms made virtually identical products and that the absence of discussion of trade secrets in the Consolidation Evidence tends to show the absence of trade secrets. (See Omnibus Opp'n at 48-49.) The probative value, if any, of Consolidation Evidence demonstrating that TydenBrooks' manufacturing process was not secret is far outweighed by the danger of unfair prejudice from being portrayed as firing hundreds to send jobs overseas. See Fed R. Evid. 403. For example, CSS claims that TydenBrooks attempted to execute an "express strategy ... to eliminate domestic jobs in many different areas of [the] company to reap cost savings associated with offshoring the work due to the lower cost of labor in Asia." (Omnibus Opp'n at 53-54.) Even if CSS' characterization were accurate, this evidence has no tendency to make a finding of misappropriation of trade secrets more or less likely and therefore is of limited probative value. See Fed. R. Evid. 401. On the other side of the ledger, the Consolidation Evidence would almost certainly bias the jury against TydenBrooks, which is improper under Rule 401. See Faulkner v. Nat'l Geographic Soc., 576 F.Supp.2d 609, 613 (S.D.N.Y. 2008) (excluding evidence as irrelevant where "[i]ts only function would be in service of an attempt by plaintiff to prejudice the jury's assessment ...

by portraying defendants in an unflattering light."). CSS'
"lower quality" argument that TydenBrooks' "ineffective and
inefficient" manufacturing process, even if secret, "has no
competitive value and is not entitled to trade secret protection
under law" (see Omnibus Opp'n at 50) also fails because, as
stated above, TydenBrooks is not seeking damages for loss of
customers. Accordingly, Consolidation Evidence supposedly
demonstrating TydenBrooks' manufacturing process was not secret
is excluded as irrelevant.

### 4. Measures to Guard Trade Secrets

In claiming misappropriation of trade secrets,
"[p]laintiff must show that it took substantial measures to
protect the secret nature of its information." Big Vision
Private Ltd. v. E.I. DuPont De Nemours & Co., 1 F.Supp.3d 224,
267 (internal citation omitted). CSS argues that in connection
with the consolidation of operations and offshoring TydenBrooks
"sen[t] all or parts of its allegedly secret manufacturing
process to Mexico and China, the piracy capital of the world ...
[and] also laid off hundreds of employees without any
contractual restrictions (such as non-competition provisions) on
their future employment." (Omnibus Opp'n at 50.) However, the
Court notes this claim is unaccompanied by citation to specific
evidence; moreover, the argument contains the same type of

unduly prejudicial evidence of layoffs excluded above.  To the
extent there is evidence to support CSS' claim regarding
TydenBrooks' failure to guard trade secrets, CSS may propose
ways to submit it without the prejudicial material.

    5. <u>Inducing Employees to Leave</u>

        CSS argues that it did not induce TydenBrooks'
employees to leave in order to gain access to TydenBrooks' trade
secrets but that the Consolidation Evidence shows that
TydenBrooks' employees left because of the closing of
TydenBrooks' domestic facilities.  (<u>See</u> Omnibus Opp'n at 50-55.)
TydenBrooks argues that it did not "induce" employees to leave
with the prospect of termination or overseas assignments[5] but,
even if it had, the employees' motive for doing so is
irrelevant.  The only relevant inquiry under New York law is
whether employees took and used trade secrets.  <u>See</u> <u>N. Atl.</u>
<u>Instruments, Inc. v. Haber</u>, 188 F.3d 38, 43-44 (2d Cir. 1999)
("To succeed on a claim for the misappropriation of trade
secrets under New York law, a party must demonstrate: (1) that
it possessed a trade secret, and (2) that the defendants used
that trade secret in breach of an agreement, confidential

_____

[5] <u>See</u> Pl.'s Omnibus Reply at 17 n.16 (noting that the Defendants
in this action departed to CSS prior to any reduction in force
or offshoring); Reply Decl. of Daniel B. Goldman in Support of
Pl.'s Omnibus Reply, dated Mar. 3, 2015 [dkt. no. 275], Ex. B,
at 33:3-7.

relationship or duty, or as a result of discovery by improper means."). Evidence regarding how and why employees left TydenBrooks, whether induced or not, is irrelevant to the determination of the trade secrets claim.

B. The Consolidation Evidence is Unduly Prejudicial

Regardless of the relevance judgments above, any probative value of the Consolidation Evidence is far outweighed by its potential prejudicial impact. See Fed. R. Evid. 403. CSS uses the Consolidation Evidence to cast TydenBrooks' quality and operations in a negative light (see, e.g., Omnibus Opp'n at 53) (characterizing TydenBrooks as a business that "by its repeated fumbles and missteps as the result of poor business choices ... ignored the needs of its own customers") and to portray TydenBrooks as a company firing hundreds to send jobs overseas (see, e.g., id.) (depicting TydenBrooks' efforts to "globalize" and achieve cost savings as the result of "closing domestic manufacturing, firing American workers, and offshoring production to China."). Introducing such evidence presents "an undue tendency to suggest" resolution of the trade secrets claim on an "improper basis," such as disapproval of how TydenBrooks conducts business and a resultant antipathy toward the company. Certainly, a charge of "firing American workers" to send jobs overseas suggests an "emotional" basis for decision-making, not

10

a legal one.  See Fed. R. Evid. 403, Advisory Committee Notes.

Accordingly, the prejudice of the Consolidation Evidence

outweighs its probative value.

III.   CONCLUSION

        Therefore, TydenBrooks' MIL to Exclude Reductions in

Force or Offshoring [dkt. no. 217] and MIL to Exclude

Operational Problems [dkt. no. 217] are GRANTED.  In summary,

the Consolidation Evidence is irrelevant in support of the

following arguments, and for the stated reasons: showing loss

customers is irrelevant because TydenBrooks is not seeking lost

profits from CSS; anticompetitive motivation, monopoly power,

and market share are irrelevant to the trade secrets portion of

the trial (See Bifurcation Order at 3); and that TydenBrooks'

manufacturing process is not secret, and whether TydenBrooks

induced employees to leave, have no bearing on the elements of

misappropriation of trade secrets (see N. Atl. Instruments,

Inc., 188 F.3d at 43-44).  Finally, any probative value of the

Consolidation Evidence is far outweighed by its potential

prejudicial impact.  See Fed. R. Evid. 403.

        To the extent CSS wishes to introduce evidence that

TydenBrooks failed to protect trade secrets, it may propose ways

to do so without the prejudicial material.  The Court does not

take a position regarding the relevance of anticompetitive

SPA-19

motivation, monopoly power, and market share in resolving CSS'
"sham" litigation claim, and it does not decide the remaining
motions in limine here.


SO ORDERED.


Dated:      New York, New York
            March 18, 2015

            _____
            LORETTA A. PRESKA
            Chief United States District Judge

12

SPA-20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
                                   :
E.J. BROOKS COMPANY d/b/a          :
TYDENBROOKS,                       :
                                   :        12 Civ. 2937 (LAP)
              Plaintiff,           :
                                   :        ORDER
                                   :
        v.                         :
                                   :
CAMBRIDGE SECURITY SEALS,          :
et al.,                            :
                                   :
                                   :
              Defendants.          :
                                   :
------------------------------X

LORETTA A. PRESKA, Chief United States District Judge:

        E.J. Brooks Company d/b/a TydenBrooks ("TydenBrooks")

brings this action alleging, among other claims, that Cambridge

Security Seals, et al. ("CSS") stole trade secrets from

TydenBrooks.  (See Amended Complaint, dated Oct. 22, 2013 [dkt.

no. 104].)  In anticipation of trial, TydenBrooks made seven

motions in limine (Notice of Pl.'s Mots. in limine, dated Jan.

29, 2015 [dkt. no. 217]), and CSS made three motions in limine

(Notice of Defs.' Mots. in limine, dated Jan. 30, 2015 [dkt. no.

225]).

        At a conference held on April 15, 2015 at 12:00 p.m.,

the Court made the following rulings regarding TydenBrooks' and

CSS' motions in limine, memorialized here as well:

1

1. TydenBrooks' motion to limit evidence concerning third party security seals [dkt. no. 217] is GRANTED.

2. CSS' motion to exclude the opinions and proposed testimony of TydenBrooks' witness, William S. Howard, PH.D. ("Dr. Howard") [dkt. no. 225] is GRANTED IN PART and DENIED IN PART.  Dr. Howard may testify as to whether it is likely or not that CSS could have developed and implemented its manufacturing processes without knowledge and use of TydenBrooks' manufacturing processes.  Dr. Howard may not (i) testify as to whether TydenBrooks' manufacturing processes are trade secrets or (ii) offer testimony duplicative of that offered by TydenBrooks' witness, James A. Kirk, PH.D. ("Dr. Kirk").

3. CSS' motion to exclude certain opinions and proposed testimony of Dr. Kirk [dkt. no. 225] is GRANTED IN PART and DENIED IN PART.  Dr. Kirk may testify as to whether (i) TydenBrooks' manufacturing processes add value to its business and (ii) CSS' machines appear to be copies of TydenBrooks' machines.  Dr. Kirk may not testify as to whether TydenBrooks' manufacturing processes constitute trade secrets.  Specifically, Dr.

2

SPA-22

Kirk may not characterize TydenBrooks' manufacturing processes as trade secrets in opining on the value added to TydenBrooks by those processes, or for any other reason.  (<u>See</u> Kirk Report[1] at IV. ¶ 4.)

SO ORDERED.

Dated:       New York, New York
             April 15, 2015

_____
LORETTA A. PRESKA
Chief United States District Judge

---

[1] Expert Report of Dr. James A. Kirk Regarding Trade Secrets, dated June 2, 2014, <u>attached as</u> Ex. A to CSS'S Mem. of Law in Support of Their Motion <u>in limine</u> to Exclude Certain Opinions and Proposed Testimony of TydenBrooks's Witness, James A. Kirk, PH.D., dated Feb. 17, 2015 [dkt. no. 239].

3



```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
                              :
E.J. BROOKS COMPANY d/b/a     :
TYDENBROOKS,                  :
                              :      12 Civ. 2937 (LAP)
              Plaintiff,      :
                              :      ORDER
         v.                   :
                              :
CAMBRIDGE SECURITY SEALS,     :
et al.,                       :
                              :
              Defendants.     :
                              :
------------------------------X
```

LORETTA A. PRESKA, Chief United States District Judge:

        E.J. Brooks Company d/b/a TydenBrooks ("TydenBrooks")
brings this action alleging, among other claims, that Cambridge
Security Seals, et al. ("CSS") stole trade secrets from
TydenBrooks.  (See Amended Complaint, dated Oct. 22, 2013 [dkt.
no. 104].)  In anticipation of trial, both TydenBrooks (Notice
of Pl.'s Mots. in limine, dated Jan. 29, 2015 [dkt. no. 217]),
and CSS made motions in limine (Notice of Defs.' Mots. in
limine, dated Jan. 30, 2015 [dkt. no. 225]).  The Court's
rulings on the motions in limine include: bifurcating the trial
proceedings, and excluding evidence of "subjective intent"
during Phase I ("March 5 Order") [dkt. no. 278]; and excluding
certain evidence of TydenBrooks' operational problems and
reductions in force or offshoring ("March 18 Order")
[dkt. no. 280].

1

SPA-24

Notwithstanding the Court's rulings, the parties are unable to agree as to the admissibility of certain "subjective intent" evidence.  Specifically, CSS wishes to introduce thirteen documents and certain deposition testimony during Phase I that TydenBrooks argues is "subjective intent" evidence that is inadmissible pursuant to the Court's March 5 Order and March 18 Order.  (See Letter from Daniel Goldman, dated Apr. 13, 2015 ("Pl.'s Objections") [dkt. no. 302].)  Having reviewed the parties' subsequent letters,[1] the Court rules on Pl.'s Objections as follows:

Exhibit 1: Probative value outweighed by danger of unfair prejudice.  Objection SUSTAINED.  See Fed. R. Evid. ("Rule") 403.

Exhibit 2: To the extent TydenBrooks argues that CSS and its employees took actions intended to conceal their theft of TydenBrooks' trade secrets, CSS may offer this evidence for the purpose of arguing that these actions were instead intended to shield CSS and its employees from potential retribution by TydenBrooks and its employees. Objection OVERRULED.

---

[1] See Letter from Howard W. Schub, dated Apr. 15, 2015 [dkt. no. 307]; Letter from Daniel B. Goldman, dated Apr. 15, 2015 [dkt. no. 309]; Letter from Howard W. Schub, dated Apr. 15, 2015 [dkt. no. 312].

Exhibit 3: Probative value outweighed by danger of unfair prejudice.  Evidence refers to TydenBrooks' operational problems.  Objection SUSTAINED.  See Rule 403; see also March 18 Order.

Exhibit 4: Probative value outweighed by danger of unfair prejudice.  Evidence refers to TydenBrooks' operational problems.  Objection SUSTAINED.  See Rule 403; see also March 18 Order.

Exhibit 5: Primarily relates to TydenBrooks' operational problems.  Objection SUSTAINED.  See March 18 Order.

Exhibit 6: Probative value outweighed by danger of unfair prejudice.  Evidence refers to TydenBrooks' operational problems and reduction in force or offshoring.  Objection SUSTAINED.  See Rule 403; see also March 18 Order.

Exhibit 7: To the extent TydenBrooks argues that CSS and its employees took actions intended to conceal their theft of TydenBrooks' trade secrets, CSS may offer this evidence for the purpose of arguing that these actions were instead intended to shield CSS and its employees from potential retribution by TydenBrooks and its employees.  Objection OVERRULED.

3

SPA-26

Exhibit 8: To the extent that TydenBrooks argues that CSS and its employees took actions intended to conceal their theft of TydenBrooks' trade secrets, CSS may offer this evidence for the purpose of arguing that these actions were instead intended to shield CSS and its employees from potential retribution by TydenBrooks and its employees. Objection OVERRULED.

Exhibit 9: Probative value outweighed by danger of unfair prejudice.  Evidence refers to TydenBrooks' operational problems.  Objection SUSTAINED.  See Rule 403; see also March 18 Order.

Exhibit 10: Evidence refers to TydenBrooks' subjective intent in bringing trade secrets claim. Objection SUSTAINED.  See March 5 Order.

Exhibit 11: Evidence refers to TydenBrooks' subjective intent in bringing trade secrets claim.  Objection SUSTAINED.  See March 5 Order.

Exhibit 12: Probative value outweighed by danger of unfair prejudice.  Evidence refers to TydenBrooks' operational problems and reduction in force.  Objection SUSTAINED.  See Rule 403; see also March 18 Order.

Exhibit 13: Probative value outweighed by danger of unfair prejudice.  Objection SUSTAINED.  See Rule 403.

4

The Court does not address Exhibit 14 here and instead will do so from the bench on April 20, 2015, prior to the commencement of trial.

CONCLUSION

For the reasons above, TydenBrooks' objections to admitting Exhibits 1, 3, 4, 5, 6, 9, 10, 11, 12, and 13 are SUSTAINED.  TydenBrooks' objections to admitting Exhibits 2, 7, and 8 are OVERRULED, but only to the extent that TydenBrooks uses this evidence in arguing that CSS and its employees took action for the purpose of concealing their theft of TydenBrooks' trade secrets.  If TydenBrooks makes that argument, CSS may use Exhibits 2, 7, and 8 to rebut it.  The Court does not rule on Exhibit 14 at this time.

SO ORDERED.

Dated:      New York, New York
            April 17, 2015

_____
LORETTA A. PRESKA
Chief United States District Judge

5

SPA-28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
E.J. BROOKS COMPANY d/b/a
TYDENBOOKS,

                                        Plaintiff,                                    12 **CIVIL** 2937 (LAP)

            -against-                                                          __JUDGMENT__

CAMBRIDGE SECURITY SEALS, et al.,
                                        Defendants.
--------------------------------------------------------X

A Jury Trial before the Honorable Loretta A. Preska, United States District Judge, having

begun on April 20, 2015, and at the conclusion of the trial, on May 4, 2015, the jury having rendered

a verdict in favor of the plaintiff E.J. Brooks Company d/b/a/ Tydenbrooks as follows:

1.       against defendant Cambridge Security Seals ("CSS") in the amount of $1,300,000.00
         for defendant's misappropriation of trade secret; $1,300,000.00 for defendant's
         competing unfairly; $1,300,000.00 for defendant's unjust enrichment;

2.       against defendant Brian Lyle in the amount of $2,000.00 for defendant's competing
         unfairly; $2,000.00 for defendant's unjust enrichment;

3.       against defendant Gurmeet Singh Grover ("Grover Singh") in the amount of
         $2,000.00 for defendant's misappropriation of trade secret; $2,000.00 for defendant's
         competing unfairly; $2,000.00 for defendant's unjust enrichment; and

4.       against defendant Michael Gizzarelli in the amount of $2,000.00 for defendant's
         misappropriation of trade secret; $2,000.00 for defendant's competing unfairly;
         $2,000.00 for defendant's unjust enrichment, it is,

**ORDERED, ADJUDGED AND DECREED:**  That the plaintiff E.J. Brooks

Company d/b/a/ Tydenbrooks have judgment as follows:

1.      against defendant Cambridge Security Seals in the total sum of $3,900,000.00;

2.      against  defendant Brian Lyle in the total sum of $4,000.00;

3.      against defendant Gurmeet Singh Grover in the total sum of $6,000.00; and

4.      against defendant Michael Gizzarelli in the total sum of $6,000.00.

**DATED:** New York, New York
      May    , 2015

**So Ordered:**

_____
U.S.D.J.

**RUBY J. KRAJICK**
_____
**Clerk of Court**

BY:
_____
**Deputy Clerk**

**THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON _____**

SPA-30

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
                                   :
E.J. BROOKS COMPANY d/b/a          :   12-CV-2937 (LAP)
TYDENBROOKS                        :
                                   :
              Plaintiff,           :   MEMORANDUM & ORDER
                                   :
         v.                        :
                                   :
CAMBRIDGE SECURITY SEALS, et al.,  :
                                   :
              Defendants.          :
                                   :
-----------------------------------X
```

LORETTA A. PRESKA, Chief United States District Judge:

      The above-captioned matter came before this Court for a jury trial commencing April 20, 2015.  At the conclusion of the trial, on May 4, 2015, the jury returned a unanimous verdict in favor of Plaintiff E.J. Brooks d/b/a TydenBrooks ("Plaintiff" or "Tyden") on claims of misappropriation of trade secrets, unfair competition, and unjust enrichment.  (See Jury Verdict Form, dated May 4, 2015 [dkt. no. 339] ("Verdict Form").)  However, the jury did not find Defendant Cambridge Security Seals ("Defendant" or "CSS") liable on Tyden's fourth charge, conspiracy to misappropriate trade secrets.  (Id.)  The jury awarded Tyden compensatory damages against Defendant CSS of $1,300,000 for misappropriation of trade secrets, §1,300,000 for

unfair competition, and $1,300,000 for unjust enrichment.[1]   (Id.)
The Clerk of Court then entered judgment accordingly.   (See
Judgment, dated May 13, 2015 [dkt. no. 321] ("Judgment").)

Defendant CSS has now moved for judgment as a matter
of law or a new trial pursuant to Federal Rules of Civil
Procedure 50 and 59 or, in the alternative, to alter or amend
the judgment under Rule 59.   (Def.'s Mot. to Vacate or Modify
the Judgment, dated June 11, 2015 [dkt. no. 342] ("CSS' Mot.").)
For the following reasons, Defendant's motion is DENIED.

I.   BACKGROUND

Plaintiff Tyden brought an action against Defendant
CSS alleging, among other claims, misappropriation of trade
secrets, conspiracy to misappropriate trade secrets, unfair
competition, and unjust enrichment.   (See Pl.'s Am. Compl.,
dated Oct. 22, 2013 [dkt. no. 104].)   CSS responded by Answer
and asserted a counterclaim, alleging that Tyden's suit

---

[1] The jury also awarded compensatory damages against the
individual Defendants as follows: against Brian Lyle of $2,000
for unfair competition and $2,000 for unjust enrichment; against
Gurmeet Singh Grover ("Grover Singh") of $2,000 for
misappropriation of trade secrets, $2,000 for unfair
competition, and $2,000 for unjust enrichment; and against
Michael Gizzarelli of $2,000 for misappropriation of trade
secrets, $2,000 for unfair competition, and $2,000 for unjust
enrichment.   The present motion was brought only by Defendant
CSS and not by the individual Defendants, though these parties
will be referred to collectively herein as the "Defendants."

SPA-32

constituted tortious interference with a prospective contract. (See Defs.' Answer, filed Nov. 21, 2013 [dkt. no. 117].)

In anticipation of trial, the parties each made motions in limine. (Notice of Pl.'s Mots. in limine, dated Jan. 29, 2015 [dkt. no. 217]; Notice of Defs.' Mots. in limine, dated Jan. 30, 2015 [dkt. no. 225].) The Court granted several of Tyden's motions, including motions to exclude evidence of Tyden's operational problems, the reduction of its workforce, and the offshoring of its manufacturing facilities. (See Order, dated Mar. 18, 2015 [dkt. no. 280].) The Court also granted in part and denied in part CSS' motions to exclude certain proposed testimony of Tyden's expert witnesses, Dr. James Kirk and Dr. William Howard. The Court barred both Dr. Howard and Dr. Kirk from testifying whether Tyden's manufacturing processes constitute trade secrets. (See Order, dated Apr. 15, 2015 [dkt. no. 308], at 2-3.) However, the Court permitted Dr. Howard to testify as to the likelihood of CSS' developing and implementing its manufacturing processes without the knowledge and use of Tyden's processes. (Id. at 2.) The Court also allowed Dr. Kirk to testify whether Tyden's manufacturing processes add value to its business and whether CSS' machines appear to be copies of Tyden's. (Id.)

In addition to its motions in limine, CSS filed a pre-trial motion for judgment as a matter of law. (See Defs.' Mot.

3

for Judgment as a Matter of Law, dated Mar. 30, 2015 [dkt. no. 284].)  The Court denied this motion without prejudice to renewal after Tyden concluded its direct case.  (See Order, dated Apr. 2, 2015 [dkt. no. 287].)

Trial commenced on April 20, 2015.[2]  After opening statements, Tyden called several current and former Tyden employees, including Mr. Boyd Coggins and Mr. Ralph Mallozzi. Mr. Coggins, a current Tyden employee, testified about his personal knowledge of Tyden's (and its predecessor company, Stoffel Seal's) manufacturing processes for different types of plastic indicative security seals.  (See, e.g., Tr. 63-146.) Mr. Mallozzi, a former Tyden employee who spent twenty years at the company, described Tyden's policies and procedures for maintaining the confidentiality of its manufacturing processes. (See, e.g., Tr. 388:22-391:24.)

Tyden also called several expert witnesses.  Dr. Kirk testified that, after comparing Tyden's manufacturing processes for plastic indicative seals with the corresponding CSS processes, he found that CSS had essentially copied Tyden's processes.  (Tr. 199:13-200:2, 201:8-259:2.)  Dr. Howard

---

[2] The trial transcript is available on ECF as follows (all dates 2015): April 20 [dkt. no. 324]; April 21 [dkt. no. 326]; April 22 [dkt. no. 328]; April 23 [dkt. no. 330]; April 24 [dkt. no. 332]; April 27 [dkt. no. 334]; May 4 [dkt. no. 336].  All references to the trial transcript herein are denoted as "Tr."

testified that it would be "extraordinarily unlikely" for two engineering groups, such as CSS and Tyden, to develop nearly identical manufacturing processes and that it would have taken CSS "considerably longer" to develop and implement its manufacturing processes without knowledge and use of Tyden's processes. (Tr. 529:18-530:1, 530:3-531:6.)  Finally, Tyden's damages expert, Dr. Robert Vigil, testified that an appropriate measure of damages in this case would be based on the amount CSS "gained" by avoiding the costs of developing its own manufacturing processes.  (Tr. 696:13-697:1.)

At the close of Tyden's evidence, the Defendants renewed their motion for judgment as a matter law, which the Court denied.  (See Tr. 790:07-11, 816:03-04.)  The Defendants then offered testimony from several of their own witnesses and, following summations, the case was submitted to the jury.  The jury found CSS and certain individual Defendants liable for misappropriation of trade secrets, unfair competition, and unjust enrichment.  (See Verdict Form [dkt. no. 339].)  The jury awarded Tyden compensatory damages against Defendant CSS in the total sum of $3,900,000 and against certain individual Defendants for lesser amounts.  (See Judgment [dkt. no. 321].)  Subsequently, CSS filed a motion to vacate or modify the judgment (CSS' Mot. [dkt. no. 342]).

II.   LEGAL STANDARDS

    A.   <u>Fed. R. Civ. P. ("Rule") 50(b)</u>

        Federal Rule of Civil Procedure ("Rule") 50(b)
provides that a party, having made a prior motion for judgment
as a matter of law that was denied, "may file a renewed motion
for judgment as a matter of law" after entry of the judgment.
Fed. R. Civ. P. 50(b).  A party's post-trial motion, though, "is
limited to those grounds that were 'specifically raised in the
prior motion for [JMOL].'"  <u>McCardle v. Haddad</u>, 131 F.3d 43, 51
(2d Cir. 1997) (quoting <u>Samuels v. Air Transport Local 504</u>, 992
F.2d 12, 14 (2d Cir. 1993)).  "[I]f an issue is not raised in a
previous motion for a directed verdict, a Rule 50(b) motion
should not be granted unless it is 'required to prevent manifest
injustice.'"  <u>Cruz v. Local Union No. 3 of Int'l Bhd. Of Elec.</u>
<u>Workers</u>, 34 F.3d 1148, 1155 (2d Cir. 1994) (quoting <u>Baskin v.</u>
<u>Hawley</u>, 807 F.2d 1120, 1134 (2d Cir. 1986)).

        If an issue has been raised previously, a district
court may set aside a jury verdict and grant the moving party
judgment as a matter of law where:

> (1) there is such a complete absence of evidence
> supporting the verdict that the jury's findings could
> only have been the result of sheer surmise and
> conjecture, or (2) there is such an overwhelming
> amount of evidence in favor of the movant that
> reasonable and fair minded persons could not arrive at
> a verdict against it.

SPA-36

McClain v. Pfizer, Inc., 505 F. App'x 59, 61 (2d Cir. 2012)

(summary order) (quoting Millea v. Metro-N. R.R. Co., 658 F.3d

154, 161 (2d Cir. 2011)).  In making its determination, a court

"'must give deference to all credibility determinations and

reasonable inferences of the jury,' and may not weigh the

credibility of witnesses or otherwise consider the weight of the

evidence." Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 133

(2d Cir. 2008) (quoting Caruolo v. John Crane, Inc., 226 F.3d

46, 51 (2d Cir. 2000)).  Thus, judgment as a matter of law

"should be granted cautiously and sparingly." Meloff v. N.Y.

Life Ins. Co., 240 F.3d 138, 145 (2d Cir. 2001) (citation

omitted).

    B.   Fed. R. Civ. P. ("Rule") 59(b)

        At the same time that a party makes a post-trial

motion under Rule 50(b), it also may raise a motion for a new

trial under Fed. R. Civ. P. ("Rule") 59(b).  Unlike a Rule 50

motion, a court may independently weigh the evidence when

evaluating a motion for a new trial and can grant the motion

despite the existence of "substantial evidence" supporting the

verdict.  See DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d

124, 134 (2d Cir. 1998).  However, a motion for a new trial

should be granted only when the court "'is convinced that the

jury has reached a seriously erroneous result or that the

verdict is a miscarriage of justice.'" <u>R.R. Love, Ltd. v. TVT Music, Inc.</u>, 282 F. App'x 91, 93 (2d Cir. 2008) (summary order) (quoting <u>DeFalco v. Bernas</u>, 244 F.3d 286, 305 (2d Cir. 2001)).

In particular, "'[i]f a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount.'" <u>Lee v. Edwards</u>, 101 F.3d 805, 808 (2d Cir. 1996) (quoting <u>Tingley Sys. Inc. v. Norse Sys., Inc.</u>, 49 F.3d 93, 96 (2d Cir. 1995)). <u>See generally</u> <u>Gasperini v. Ctr. for Humanities, Inc.</u>, 518 U.S. 415, 433 (1996). The Court of Appeals has identified two distinct types of cases in which a conditional remittitur is appropriate:

> (1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, . . . and (2) more generally, where the award is 'intrinsically excessive' in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error.

<u>Kirsch v. Fleet St. Ltd.</u>, 148 F.3d 149, 165 (2d Cir. 1998) (quoting <u>Trademark Research Corp. v. Maxwell Online, Inc.</u>, 995 F.2d 326, 337 (2d Cir. 1993)).

C.   <u>Fed. R. Civ. P. ("Rule") 59(b)</u>

Under Fed. R. Civ. P. ("Rule") 59(e), a party also may bring a post-verdict motion "to alter or amend a judgment."

SPA-38

Fed. R. Civ. P. 59(e).  Rule 59(e) "'covers a broad range of motions,' and . . . 'the only real limitation on the type of the motion permitted is that it must request a substantive alteration of the judgment, not merely the correction of a clerical error, or relief of a type wholly collateral to the judgment.'"  ING Global v. United Parcel Serv. Oasis Supply Corp., 757 F.3d 92, 96 (2d Cir. 2014) (quoting Schwartz v. Liberty Mut. Ins. Co., 539 F.3d 135, 153 (2d Cir. 2008)).

However, "[g]enerally, district courts will only amend or alter a judgment pursuant to Rule 59 'to correct a clear error of law or prevent manifest injustice.'"  In re Assicurazioni Generali, S.P.A., 592 F.3d 113, 120 (2d Cir. 2010) (quoting Munafo v. Metro. Transp. Auth., 381 F.3d 99, 105 (2d Cir. 2004)).  Thus, this standard "provide[s] relief only in the proverbial 'rare case.'"  Corsair Special Situations Fund, L.P. v. Nat'l Res., 595 F. App'x 40, 44 (2d Cir. 2014) (summary order) (citation omitted); see also Space Hunters, Inc. v. United States, 500 F. App'x 76, 81 (2d Cir. 2012) (summary order) ("[R]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." (quoting Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995))).

III. DISCUSSION

    A.    <u>Defendant CSS is Not Entitled to Judgment as a Matter</u>
        <u>of Law or a New Trial on the Issue of Avoided Costs</u>

        1.  <u>Avoided Costs are an Appropriate Measure of Damages</u>

In the motion before this Court, CSS renews its objection to avoided development costs as a measure of damages. (<u>See</u> Def.'s Mem. in Supp. of Mot. to Vacate, dated June 11, 2015 [dkt. no. 343] ("CSS' Mem."), at 4-6; Def.'s Reply Mem. in Supp. of Mot. to Vacate, dated Aug. 3, 2015 [dkt. no. 349] ("CSS' Reply"), at 1-3.)  Tyden maintains, as it did both prior to and at trial, that avoided development costs are an appropriate measure of damages.  (<u>See</u> Pl.'s Mem. in Opp'n to Def.'s Mot. to Vacate, dated July 15, 2015 [dkt. no. 346] ("Tyden's Opp'n"), at 3-6.)  When CSS raised its objection to this measure of damages at trial, the Court considered CSS' argument, rejected it, and instructed the jury on avoided development costs.  (Tr. 816:3-4, 1067:1-1068:21.)  Here, the Court again rejects CSS' argument for substantially the same reasons.

      CSS correctly notes that, in this Circuit, "the amount of damages recoverable in an action for misappropriation of trade secrets may be measured either by the plaintiff's losses . . . or by the profits unjustly received by the defendant." <u>A.F.A. Tours, Inc. v. Whitchurch</u>, 937 F.2d 82, 87 (2d Cir.

1991).   A third measure of damages, a "reasonable royalty," also may be used in cases where these two methods of calculating damages provide inadequate compensation to plaintiff.   See LinkCo, Inc. v. Fujitsu Ltd., 232 F. Supp. 2d 182, 186-87 (S.D.N.Y. 2002).

CSS suggests that the Court should adopt a strict interpretation of "profits" and "losses," which does not include avoided development costs as a measure of damages.   (See CSS' Mem. [dkt. no. 343], at 4; CSS' Reply [dkt. no. 349], at 1 ("No New York case authorizes 'avoided costs.'").)   Further, CSS argues that, in the absence of calculable profits or losses, a reasonable royalty should be the only alternate measure of damages.   (See CSS' Reply [dkt. no. 349], at 1.)

However, CSS' suggested interpretation of these terms is too narrow.   CSS' avoided development costs could just as aptly be categorized as Tyden's "losses" or CSS' "gains".   In this Circuit, courts have adopted liberal readings of these categories and, in particular, "have diverged from a straight lost profits analysis in cases where plaintiff's losses and defendant's actual gain cannot be easily computed."   LinkCo, Inc. v. Fujitsu Ltd., 230 F. Supp. 2d 492, 503 (S.D.N.Y. 2002); see also Matarese v. Moore-McCormack Lines, 158 F.2d 631, 637 (2d Cir. 1946) ("Where the fact of damages is certain, the uncertainty of the amount will not prevent their being

11

SPA-41

assessed."); In re Cross Media Mktg. Corp., 2006 WL 2337177, at
*6 (S.D.N.Y. Aug. 11, 2006) ("'[T]he lack of actual profits does
not insulate the defendants from being obliged to pay for what
they have wrongfully obtained.'" (quoting Univ. Computing Co. v.
Lykes-Youngstown Corp., 504 F.2d 518, 536 (5th Cir. 1974))).

          Thus, as in the present case, a plaintiff's losses or
a defendant's gains may be measured by the avoided cost of
developing the trade secret.  Indeed, this methodology has been
implicitly recognized in this Circuit.  See, e.g., Matarese, 158
F.2d at 635-37 (affirming damages for an unjust enrichment claim
based on misappropriation of information by calculating the
costs avoided by defendant); In re Cross Media Mktg. Corp., 2006
WL 2337177, at *5 ("[T]he plaintiff's losses . . . may include
the cost of developing the trade secret."); LinkCo, 232 F. Supp.
2d at 185 ("[D]amages may be measured according to any losses
plaintiff suffered from the alleged misappropriation.
Plaintiff's losses may include the cost of developing the trade
secret . . . .").  See also Restatement (Third) of Unfair
Competition § 45 cmt. f (1995) ("If the benefit derived by the
defendant consists primarily of cost savings, such as when the
trade secret is a more efficient method of production, the
'standard of comparison' measure that determines relief based on
the savings achieved through the use of the trade secret may be
the most appropriate measure of relief.").

12

SPA-42

In In re Cross Media Mktg. Corp., for example, the court affirmed that the defendants, who had stolen the plaintiff's customer list and had attempted to auction it off, were guilty of misappropriation of trade secrets and unjust enrichment.  2006 WL 2337177, at *5-6.  Although the defendants had not actually made any profits from their theft, the court found that the appropriate extent of damages could be calculated based on how much it had cost the plaintiff to develop the customer list.  Id. ("The Bankruptcy Court's award of damages based upon Cross Media's loss, calculated by determining the development cost of the customer lists, was adequate to compensate Cross Media and properly determined.")

Several other Circuits also have recognized this method of calculating damages.  See, e.g., Wellogix, Inc. v. Accenture, L.L.P., 716 F.3d 867, 879 (5th Cir. 2013) ("Damages in misappropriation cases can [include] . . . the development costs the defendant avoided incurring through misappropriation . . . ." (citation omitted)); Bourns, Inc. v. Raychem Corp., 331 F.3d 704, 710 (9th Cir. 2003) (affirming award of damages based on avoided development costs in misappropriation case); Avery Dennison Corp. v. Four Pillars Enter. Co., 45 F. App'x 479, 486 (6th Cir. 2002) (per curiam) (misappropriation damages may be based on "the value derived from savings because of increased productivity, or the value derived from savings in research

13

SPA-43

costs"); <u>Telex Corp. v. IBM Corp.</u>, 510 F. 2d 894, 930-32 (10th Cir. 1975) (per curiam) (same), <u>cert. denied</u>, 423 U.S. 802 (1975), <u>abrogation on other grounds recognized by Novell Inc. v. Microsoft Corp.</u>, 731 F.3d 1064 (10th Cir. 2013); <u>Int'l Indus., Inc. v. Warren Petroleum Corp.</u>, 248 F.2d 696, 702 (3d Cir. 1957) ("Where the thing appropriated or infringed is a process rather than a manufactured article, the profits are simply measured by the savings determined by the standard of comparison computation."), <u>cert. denied</u>, 355 U.S. 943 (1958).

Similarly, in the instant case, Tyden suggests that CSS' avoided development costs are one method of measuring CSS' unjust gains.  As Tyden argues, "CSS 'profited' from its theft of Tyden's trade secret by avoiding the significant research and development, labor and capital costs it would have incurred had it developed its own processes for manufacturing plastic indicative seals from scratch."  (Tyden's Opp'n [dkt. no. 346], at 6.)

This theory of damages was supported by Tyden's damages expert, Dr. Vigil.  (<u>See</u> Tr. 696:13-697:1; <u>see also</u> Decl. of Michel, dated Mar. 30, 2015 [dkt. no. 294] Ex. W-1 ("Vigil Report"), at 34-37.)  Dr. Vigil noted in his expert report that, although he had found "evidence that TydenBrooks lost sales and profits as a result of Cambridge's misappropriation of trade secrets . . . [he was] unable to

14

precisely quantify the exact amount of sales TydenBrooks lost
due to Cambridge's theft of TydenBrook's trade secrets." (Vigil
Report [dkt. no. 294], at 2.)  Dr. Vigil testified at trial,
therefore, that a more appropriate method of calculating damages
in the instant case would be based on the Defendant's
"disgorgement of unjust gains" and that "[a]voided costs would
be a type of disgorgement." (Tr. 696:15-20.)  This
disgorgement, Dr. Vigil described, could be calculated by
determining "how much [a company] gain[ed] by taking and using
information that didn't belong to them." (Tr. 696:21-23.)  Dr.
Vigil further noted that this analysis would apply not only to
the misappropriation of trade secrets claim, but also to Tyden's
unfair competition and unjust enrichment claims. (Tr. 709:3-7,
709:17-19.)

        Indeed, at trial, the jury was instructed to calculate
the damages based on the "benefits derived by the defendant" and
the "costs avoided by the defendant." (Tr. 1067:4-8.)  The
Court further explained to the jury that, in evaluating cost
savings, the jury must "compare actual costs incurred by the
defendant . . . with the costs [the defendant] would have
incurred to produce the same products without the use and
knowledge of TydenBrooks' manufacturing process" and that it was
the difference in these costs that the jury should award as
damages. (Tr. 1068:9-21.)  Thus, as the jury found, CSS

15

unjustly gained because it was able to avoid the costs associated with developing its own manufacturing processes.

Finally, the Court notes that CSS had more-than-adequate notice of Tyden's theory of damages.  Dr. Vigil laid out the avoided costs theory of damages in his June 2, 2014 expert report, nearly one year before the trial commenced.  (See Vigil Report [dkt. no. 294] Ex. W-1, 34-37.)  Additionally, as described above, Dr. Vigil testified at length during the trial about this theory of damages and CSS subsequently cross-examined Dr. Vigil on this topic.  (Tr. 696:13-697:1, 698:12-708:19.)

Accordingly, for these reasons, the Court again determines that avoided development costs are an appropriate measure of damages in this case and DENIES Defendant CSS' motion on this basis.

2.   Defendants Proximately Caused Tyden's Injury

For the first time, CSS raises in its motion before the Court that Tyden did not prove Defendants' conduct proximately caused injury to Tyden.  However, a party's post-trial motion "is limited to those grounds that were 'specifically raised in the prior motion for [JMOL].'" McCardle, 131 F.3d at 51 (quoting Samuels, 992 F.2d at 14). While courts reserve the discretion to grant judgment as a matter of law even when an issue has not been previously raised

in a motion, such discretion is reserved for cases of "manifest injustice" and no such case is presented here.  See Cruz, 34 F.3d at 1155.

CSS previously submitted two motions for a directed verdict.  First, CSS filed a pre-trial motion for judgment as a matter of law.  Although CSS argued in its pre-trial motion that Tyden's avoided costs theory of damages should not be applied, CSS did not raise any arguments concerning injury or proximate cause.  (See Defs.' Mot. for Judgment as a Matter of Law, dated Mar. 30, 2015 [dkt. no. 284].)  The Court rejected the motion without prejudice to renewal after Plaintiff rested its case.  (See Order, dated April 2, 2015 [dkt. no. 287].)  Second, at trial, CSS renewed the same motion for a directed verdict after Tyden finished presenting its evidence.  (See Tr. 790:7-11.)  Although CSS had the opportunity to do so, it did not articulate any additional grounds for a directed verdict or challenge the sufficiency of Tyden's evidence for either proximate cause or injury.  (Id.)  The Court again rejected CSS' motion for a directed verdict.  (See Tr. 816:3-4.)  Thus, in light of these previous motions, CSS is now procedurally barred from raising such an argument in its instant motion for judgment as a matter of law.  See McCardle, 131 F.3d at 51.

Even if CSS' arguments concerning injury and proximate cause had been preserved, these arguments still would fail on

17

SPA-47

the merits.  CSS contends that because the jury did not find
Tyden liable for conspiracy to misappropriate trade secrets, the
only claim for which the jury was explicitly instructed to find
injury and causation, the jury did not find that these elements
existed for the other claims.  (CSS' Mem. [dkt. no. 343], at 8
("The conspiracy claim was the only cause of action that
explicitly required proof of causation and injury as a distinct
element of the claim.").)  This is mere speculation that does
not warrant a vacatur or re-trial.  Indeed, the Court
specifically instructed the jury that it "may award compensatory
damages only for injuries that TydenBrooks proves were
proximately caused by a defendant's allegedly wrongful conduct"
(Tr. 1065:20-22) and that it "should not award compensatory
damages for speculative injuries, but only for those injuries
that TydenBrooks has actually suffered or which it is reasonably
likely to suffer in the near future" (Tr. 1065:24-1066:2).

     As was demonstrated at trial, CSS' interference with
Tyden's trade secret was the injury that the damages in this
case were intended to rectify.  See Ruckelshaus v. Monsanto Co.,
467 U.S. 986, 1011 (1984) ("With respect to a trade secret, the
right to exclude others is central to the very definition of the
property interest."); In re Cross Media Mktg. Corp., 2006 WL
2337177, at *4-6 (finding damages appropriate on the basis of
defendant's avoided costs because defendant had misappropriated

plaintiff's customer list).  Indeed, at trial, Tyden offered

evidence that the Defendants stole Tyden's trade secret to set

up nearly-identical manufacturing processes and, as a result,

CSS was able to avoid costs that it would have otherwise

incurred to develop such processes.  (See, e.g., Tr. 201:8-

259:5, 295:14-297:10, 614:8-14.)  This evidence was sufficient

for a reasonable jury to conclude that the Defendants' actions

proximately caused Tyden's injuries, and therefore the Court

also DENIES CSS' motion on this basis.

> 3. CSS Was Properly Precluded from Introducing Certain
>    Evidence Concerning Damages and Proximate Cause

Finally, CSS argues that a new trial is necessary

because the Court barred CSS from countering Tyden's claims with

its own evidence disproving causation and damages.  (CSS' Mem.

[dkt. no. 343], at 9.)  However, CSS chose not to call its own

damages expert, Dr. Robert Trout, despite having informed the

Court on multiple occasions that it would do so.  (Tr. 597:11-

14, 908:14-15.)  Further, the evidence that CSS attempted to

admit and that the Court barred from trial was not relevant to

the theory of damages at issue in this case and, therefore,

would not have disproven causation or damages.  For example,

prior to trial, CSS sought to introduce evidence regarding

Tyden's reductions in its domestic workforce and various

operational problems.  Tyden then filed a motion in limine to

preclude this evidence.  (Notice of Pl.'s Mot. in limine, dated
Jan. 29, 2015 [dkt. no. 217].)  The Court granted Tyden's motion
finding that, among other reasons, this evidence was not
relevant to Tyden's avoided costs theory of damages.  (See
Order, dated Mar. 18, 2015 [dkt. no. 280].)

Similarly, at trial, CSS attempted to cross-examine
Tyden's damages expert, Dr. Vigil, on topics that did not relate
to the avoided costs theory of damages and on evidence which did
not form the basis of Dr. Vigil's opinions.  (Tr. 693:1-694:13,
695:22-696:2, 697:2-11.)  Accordingly, the Court sustained
several objections during CSS' cross-examination.  (Id.)  See
LinkCo, 232 F. Supp. 2d at 185 (barring evidence of plaintiff's
sales projections and defendant's actual profits on the basis
that such evidence would be irrelevant to the measure of
damages).  Thus, because CSS was not barred from providing
evidence that was relevant to the theory of damages at issue in
this case, a new trial is not warranted and CSS' motion is
DENIED on this basis.

B.    Defendant CSS is Not Warranted Judgment as a Matter of
      Law on Tyden's Misappropriation of Trade Secrets Claim

CSS also argues that, despite the jury's verdict, the
Court should grant it judgment as a matter of law on Tyden's
misappropriation of trade secrets claim because Tyden failed to
prove that it possessed a trade secret.  (CSS' Mem. [dkt. no.

20

343], at 10-15.)  CSS, however, has not shown that there was either "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture" or that there is such an "overwhelming amount of evidence in favor of [CSS] that reasonable and fair minded persons could not arrive at a verdict against it."  See McClain, 505 F. App'x at 61.

The existence of a trade secret is a question of fact that may be determined by the jury.  See Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc., 920 F.2d 171, 174 (2d Cir. 1990).  New York courts have defined a trade secret as "'any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.'"  Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc., 118 F.3d 955, 968 (2d Cir. 1997) (quoting Restatement of Torts § 757 cmt. b, at 5 (1939)).  "'[I]t is not simply information as to single or ephemeral events in the conduct of the business;' rather, it 'is a process or device for continuous use in the operation of the business.'"  Id. (citation omitted).  The following factors may be relevant in determining whether a trade secret exists:

> (1) the extent to which the information is known
> outside of the business; (2) the extent to which it is
> known by employees and others involved in the

21

SPA-51

> business; (3) the extent of measures taken by the
> business to guard the secrecy of the information; (4)
> the value of the information to the business and its
> competitors; (5) the amount of effort or money
> expended by the business in developing the
> information; [and] (6) the ease or difficulty with
> which the information could be properly acquired or
> duplicated by others.

United States v. Mahaffy, 693 F.3d 113, 134 (2d Cir. 2012)

(quoting N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 44 (2d

Cir. 1999)).

In the instant case, the jury found Defendants guilty

of misappropriating a trade secret and, therefore, must have

determined that Tyden had a trade secret that could be

misappropriated.  CSS still argues, though, that Tyden did not

prove it possessed a trade secret because (1) Tyden did not

sufficiently identify its trade secret when it was initially

disclosed to the Defendants or at trial; (2) the alleged trade

secret was not unique; and (3) the alleged trade secret did not

give Tyden a competitive advantage.  (CSS' Mem. [dkt. no. 343],

at 10-15.)  Although the Court will address each of CSS'

arguments below, CSS has not met the high bar required for

judgment as a matter of law and, therefore, the Court declines

to disturb the jury's determination on this claim.

1. Tyden Identified its Manufacturing Processes with
   Reasonable Particularity

First, CSS contends that Tyden did not describe its alleged trade secret with sufficient particularity when it was initially disclosed to the Defendants or throughout the litigation. CSS alleges that because Tyden did not use the term "trade secret" in its communications with its employees and only used the term during its closing argument at trial, "it was impossible for the jury to find that [Tyden] 'possessed a trade secret, identifiable with reasonable particularity.'" (CSS' Mem. [dkt. no. 343], at 12 (citing Tr. 1059:20-21).)

CSS correctly argues that if a trade secret is disclosed in "vague and indefinite" terms, it does not receive the protection of trade secret laws. Heyman v. AR. Winarick, Inc., 325 F.2d 584, 590 (2d Cir. 1963) (finding "plaintiff's casual reference to a 'quaternary' was so vague and indefinite as not to be entitled to protection under the law of trade secrets"). However, a trade secret does not need to be referred to as a "trade secret" to be identified with sufficient particularity. See Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co., 1 F. Supp. 3d 224, 261 (S.D.N.Y. 2014) (finding plaintiff "need not have said the words 'trade secret'"), aff'd, 610 F. App'x 69 (2d Cir. 2015) (summary order). Instead, enough "[s]pecificity is required at the moment of divulging so that the party to whom the secret is revealed understands the contours of the secret information and does not inadvertently or

23

SPA-53

purposefully transgress its boundaries." Sit-Up Ltd. v.

IAC/InterActiveCorp., No. 05 CIV. 9292 (DLC), 2008 WL 463884, at

*11 (S.D.N.Y. Feb. 20, 2008); see also Heyman, 325 F.2d at 590.

Additionally, several courts in this district and

other Courts of Appeals have noted that a trade secret must be

identified with particularity during litigation. See, e.g., Big

Vision, 1 F. Supp. 3d at 258-259 (collecting cases). Such

specificity allows a defendant to "defend himself adequately

against claims of trade secret misappropriation" and a jury to

properly render its verdict. See Sit-Up Ltd., 2008 WL 463884,

at *11; see also Big Vision 1 F. Supp. 3d at 258-259.

Even assuming that this Court also adopts such a

requirement, Tyden introduced sufficient evidence for a

reasonable jury to conclude that a trade secret was identified

with particularity both at the time of disclosure and during

litigation. From the very beginning of the trial, Tyden

described the parameters of the trade secret at issue. Tyden

noted in its opening statement that the case concerned the

misappropriation of its manufacturing processes used to create

the "Tug Tite seal," two other "Tug Tite-like processes that

[were used to] make lighter versions of the seal," and its

"truck seal." (See, e.g., Tr. 31:3-6, 31:17-21, 33:15-20.)

Tyden's witnesses specified that the design and operation of

Tyden's fully-automated manufacturing processes were the trade

SPA-54

secrets at issue (<u>see, e.g.</u>, Tr. 147:20-25, 165:6-13) and described in detail how the manufacturing processes were programmed to operate in this fully-automated manner (<u>see, e.g.</u>, Tr. 76:1-114:13, 123:24-144:3).

Further, the individual Defendants testified that they were aware that certain information, including the design of Tyden's manufacturing processes, was confidential and proprietary. Defendant Gizzarelli noted that he had signed a "statement of principles of conduct," which informed employees of their continuing obligations to "maintain the confidentiality of confidential or proprietary information, including trade secrets." (<u>See</u> Tr. 461:24-462:5, 463:10-464:10.) Defendant Singh stated that he understood that Tyden's design drawings for its manufacturing processes, in particular, "were marked with the word confidential," were only accessible to a "select number of employees," and "were not to be shared" with Tyden's competitors. (Tr. 295:14-297:10.) Mr. Coggins also confirmed the limited accessibility of the engineering designs for the manufacturing processes, noting that "anybody on the floor, sales or anybody else, can't access those prints." (Tr. 183:15-184:3.)

Additionally, Tyden introduced evidence that, after the individual defendants left their employment with Tyden, they took steps to conceal that they had taken information about

25

**SPA-55**

Tyden's manufacturing processes.  (<u>See, e.g.</u>, Tr. 614:8-14.)
Such actions were further evidence that Defendants knew they
were misappropriating trade secrets.  <u>See</u> <u>Bourns</u>, 331 F.3d at
709 (affirming jury's trade secret finding where "[defendant]
showed its awareness of its illegal conduct by covering up its
use of [plaintiff's] information").  Thus, a jury could have
reasonably concluded that there was a trade secret at issue and
that the Defendants understood the "contours of the secret
information" both at the time the information was divulged and
throughout litigation.  <u>See</u> <u>Sit-Up Ltd.</u>, 2008 WL 463884, at *11.

> 2. <u>Tyden Demonstrated That its Manufacturing Processes
>    Were Unique</u>

Second, CSS argues that Tyden's manufacturing
processes consisted of publicly-available components that were
not combined in a unique manner.  However, as CSS suggests, a
trade secret may exist when "'characteristics and components,
each of which, by itself, is in the public domain, but the
unified process and operation of which, in unique combination,
affords a competitive advantage and is a protectable secret.'"
<u>Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions,
Inc.</u>, 732 F. Supp. 370, 376 (S.D.N.Y. 1989) (quoting <u>Imperial
Chem. Indus. Ltd. v. Nat'l Distillers & Chem. Corp.</u>, 342 F.2d
737, 742 (2d Cir. 1965)), <u>aff'd</u>, 920 F.2d 171 (2d Cir. 1990)

Tyden's witness testified that although some of the
component parts of Tyden's manufacturing processes could be
purchased as-is, many of the individual components were designed
or created by Tyden.  (Tr. 108:10-19, 160:14-16, 163:14-22.)
Mr. Coggins, for example, noted that Tyden created its own cage
picking system (Tr. 161:8-10) and designed its own assembly
table (Tr. 108:15-19).  Mr. Coggins also noted that Tyden's
"very unique programming system" ensured that all of the
component parts were synchronized and could operate without any
human intervention.  (Tr. 91:4-13.)  As a result, Tyden's
witnesses testified, the design and operation of Tyden's
manufacturing processes was the product of a "long series of
lots and lots of choices."  (Tr. 531:17-23.)

Additionally, Tyden's former Global Vice-President for
Sales and Marketing, Mr. Mallozzi, described that he had become
"very familiar" with the manufacturing processes of other
plastic seal manufacturers and that none of these manufacturers
used a fully-automated process.  (Tr. 379:19-380:6, 387:2-
388:21.)  Similarly, one of Tyden's expert witnesses—Dr. Howard—
testified that the manufacturing processes of thirteen of
Tyden's competitors were not "remotely similar to the way that
Stoffel does it."  (Tr. 537:14-19.)  Thus, based on this
testimony, there was sufficient evidence for the jury to
conclude that Tyden designed and operated a unique manufacturing

27

SPA-57

process that could not be purchased off-the-shelf and which was
not currently being used by its competing manufacturers.

> 3. <u>Tyden Demonstrated that its Manufacturing Processes
> Gave it a Competitive Advantage</u>

Third, and finally, CSS argues that Tyden did not
provide any evidence that its manufacturing processes gave it a
competitive advantage. As the Court of Appeals has noted, a
trade secret must give "an opportunity to obtain an advantage
over competitors who do not know or use it." <u>Softel</u>, 118 F.3d
at 968 (quoting Restatement of Torts § 757 cmt. b, at 5 (1939));
<u>see also</u> <u>Ruckelshaus</u>, 467 U.S. at 1011 n.15, 1012 ("[T]he value
of a trade secret lies in the competitive advantage it gives its
owner over competitors.").

Tyden's witnesses testified that the manufacturing
processes at issue in this case were more efficient and produced
higher-quality products than other processes Tyden previously
used or that are used by Tyden's competitors. As Mr. Coggins
explained, Tyden refined its manufacturing processes over a long
period of time to "stay competitive in today's market." (Tr.
57:4-7.) These refinements eventually resulted in the fully-
automated manufacturing processes that increased Tyden's output
while also decreasing the number of employees required to man
the machines. (Tr. 186:23-187:1.) As an example of these

SPA-58

improvements, Dr. Howard noted that the first generation machines that produced truck seals required "five operators to put out 3200 parts [p]er hour." (Tr. 559:15-19.) After several iterations and improvements, the Stoffel truck line now uses only one operator and produces 5,231 parts per hour. (Tr. 559:21-560:6.) Mr. Mallozzi stated that these improvements meant Tyden could supply products "with a high level of quality and security" for "thousands of customers on demand" in an expedient time frame. (Tr. 389:2-12.)

Further, Tyden's witness testified that, even compared to other manufacturers, Tyden's fully-automated processes gave it significant advantages. Mr. Mallozzi, for example, emphasized that the fully-automated manufacturing process "was literally what gave [Tyden its] edge" and that other manufacturers which did not have such processes were "certainly" at a competitive disadvantage. (Tr. 389:20-25, 418:15-19.)

Accordingly, CSS' motion for judgment as a matter of law on the basis that Tyden did not sufficiently demonstrate that it possessed a trade secret is DENIED.

C.    The Verdict is Not Duplicative and Should be Upheld

In the alternative to these arguments, CSS moves pursuant to Fed. R. Civ. P. ("Rule") 59(e), to reduce the judgment in this case to account for allegedly duplicative

29

SPA-59

claims and damage awards.  CSS argues that the claims for unfair competition and unjust enrichment are duplicative of the trade secret misappropriation claim.  (CSS' Mem. [dkt. no. 343], at 15-17.)  CSS further argues that the damages, awarded separately for each of the three claims, are also impermissibly duplicative.  (Id. at 18-19.)  CSS therefore moves pursuant to Rule 59(e) for the Court to reduce the total damage award from the current total award of $3.9 million to $1.3 million, the amount awarded for each of the three claims.  (Id. at 1, 15.)

        Initially, the Court notes that "[a] court's role is to reconcile and preserve whenever possible a seemingly inconsistent jury verdict" and that "'juries are not bound by what seems inescapable logic to judges.'"  Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 497 (2d Cir. 1995) (quoting Morissette v. United States, 342 U.S. 246, 276 (1952)).  Thus, while it is possible that the jury meant to compensate Tyden a total of $1.3 million, it is "equally rational to believe" that the jury found that Tyden suffered $3.9 million worth of damages and merely divided the award over the three causes of action. See id.  Further, because "[t]here is a presumption that a jury's award is valid . . . '[t]he possibility of non-duplicative awards is enough to sustain the jury verdict.'" MacDermid Printing Solutions, LLC v. Cortron Corp., No. 308-CV-

SPA-60

01649 (MPS), 2015 WL 251527, at *12 (D. Conn. Jan. 20, 2015)
(quoting Bseirani v. Mahshie, 107 F.3d 2 (2d Cir. 1997)).

    1. The Claims Are Not Duplicative

    First, CSS argues that Tyden's claims themselves are
inherently duplicative, apart from the damages awarded by the
jury. (CSS' Mem. [dkt. no. 343], at 15-17.) CSS notes several
cases which hold that claims for unfair competition or unjust
enrichment are duplicative of a claim for misappropriation of
trade secrets when there is the same underlying factual
predicate for each claim. See, e.g., Goldemberg v. Johnson &
Johnson Consumer Cos., Inc., 8 F. Supp. 3d 467, 483 (S.D.N.Y.
2014) (finding that an unjust enrichment claim is unavailable
when it duplicates a tort claim); Ferring B.V. v. Allergan,
Inc., 4 F. Supp. 3d 612, 629 (S.D.N.Y. 2014) ("An unfair
competition claim can only survive dismissal of a duplicative
misappropriation claim if the two rest on different factual
predicates."). But see Big Vision, 610 F. App'x at 71 ("[T]he
District Court's statements on this count do not imply a
misperception that a claim of unfair competition always requires
a breach of contract or misappropriation of trade secrets . . .
. a plaintiff need not establish misappropriation of a trade
secret, then, to state a claim for unfair competition.").

    However, generally, a Rule 59(e) motion to amend or
alter a decision should only be granted "where the Court has

31

SPA-61

overlooked factual issues or controlling decisions which were presented to it on the underlying motion." Tavarez v. United States, No. 96-CR-895 (SWK), 2005 WL 1500865, at *1 (S.D.N.Y. June 23, 2005). Rule 59(e) "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." Id. (citation omitted).

In ING Global v. United Parcel Serv. Oasis Supply Corp., the Court of Appeals was presented with a case in which a party sought to use a Rule 59(e) motion to "effectively seek[] judgment as a matter of law" by attempting "to have the jury's verdict . . . set aside and to have judgment entered in its favor on that issue." 757 F.3d at 96–97. Here, this Court is presented with an analogous fact pattern, in which CSS seeks to set aside the jury's award as to particular claims.

The court in ING Global held that because the party was attempting to use a Rule 59(e) motion as a vehicle for obtaining judgement as a matter of law, the party should be required to "comply with the carefully crafted structure and standards of Rules 50 and 51." Id. at 96. As the court noted, "[p]ermitting a party out of compliance with Rules 50 and 51 to prevail under Rule 59(e) would render those Rules, which are basic to the conduct of federal trials, essentially superfluous." Id. at 97. Under Federal Rules of Civil

32

SPA-62

Procedure 50 and 51, a party must move for judgment as a matter of law on a particular issue during the trial or object to jury instructions before they are delivered.  Fed. R. Civ. P. 50-51.

Though, in the instant case, CSS did move pursuant to Rule 50 for judgment as a matter of law before the trial (see Defs.' Mot. for Judgment as a Matter of Law, dated Mar. 30, 2015 [dkt. no. 284]), the duplicative claims issue was not raised in that motion (see Memo. of Law in Supp., dated Mar. 30, 2015 [dkt. no. 289]).  CSS merely noted in a footnote that "[i]f Tydenbrooks's trade secrets claim fails then each and every one of its remaining claims fail-as a matter of law-as they are based on CSS's purported misappropriation of trade secrets." (Id. at 1, n. 2.)  However, CSS did not argue that, if the trade secret and any of the other claims were successful, an issue of duplicative claims might arise.

Further, CSS submitted two proposed jury verdict forms, both of which asked the jury separately to apportion damages for each of the three claims (misappropriation of trade secrets, unjust enrichment, and unfair competition) and which did not indicate that any of these claims would be duplicative of one another.  (See Proposed Jury Verdict Forms, dated Apr. 8, 2015 [dkt. no. 299-1], at 5-14; Proposed Jury Verdict Forms with Amendments, dated Apr. 16, 2015 [dkt. no. 315-1], at 5-8.) Additionally, at trial, CSS' counsel stated just before his

33

closing argument that he had no objections to the final version
of the form (Tr. 981:2-10) and, when given the opportunity to
object at the close of the Court's jury charge, counsel did not
do so (id. at 1075:2-6, 1076:19-22.)  Accordingly, CSS had
several opportunities to resolve any potential juror confusion
on this issue and, instead, took actions that arguably further
compounded any such confusion.

       More generally, the Court does not find that an
amendment or alteration of the judgment is necessary to prevent
a "manifest injustice" even assuming such claims are
duplicative.  See ING Global, 757 F.3d at 96.  At trial, Dr.
Vigil testified that "at a minimum, CSS gained by taking the
information from [Tyden] by the amount of 6.1 to $12.2 million,"
(Tr. 676:11-13), and later increased that estimate to between
$7.8 million and $16.6 million (Tr. 686:15-17.)  The jury's
total award of $3.9 million is still significantly below the
minimum recommended by Dr. Vigil and even further below the $20
million sum sought by Tyden (Tr. 1039:6-7).  Further, Dr. Vigil
testified—albeit over CSS' objection—that his analysis applied
to all three claims (Tr. 709:3-19), which provides a reasonable
explanation for why the jury awarded the same amount for each
claim.

       Moreover, courts have found that where a party does
not timely raise the issue of duplicative claims and where the

34

jury's intention is clear, the jury's award should be upheld and
any objection is waived.  See, e.g., Bender v. City of New York,
78 F.3d 787, 794 (2d Cir. 1996) ("In some cases, seemingly
duplicative awards made separately for overlapping causes of
action . . . have been sustained where it appeared that the jury
intended to award the aggregate sum."); Gentile v. Cnty. of
Suffolk, 926 F.2d 142, 154 (2d Cir. 1991) ("[T]he question of
duplicative damages was not raised by defendants in their
requests to charge or in their objections to the court's
instructions on the issue of damages, and the court correctly
instructed the jury to award only those damages that would
reasonably compensate plaintiffs. . . . The policy of deferring
to a jury verdict is a powerful one . . . ."); Shukla v. Sharma,
No. 07-CV-2972 (CBA) (CLP), 2012 WL 481796, at *12 (E.D.N.Y.
Feb. 14, 2012) ("[D]espite ample opportunity, defendants did not
object to the jury instruction or verdict form, nor did they
object to the jury's verdict after it was rendered and before
the jury was discharged. Their objection is therefore waived.").

In the instant case, after the jury initially reported
its damages award, the Court asked the jurors to confer as to
whether they intended to award a total of $3.9 million, which
the foreperson then confirmed.  (Tr. 1103:19-25.)  Thus, because
the jury confirmed that it intended to award a total of $3.9

million in damages to Tyden, there can be no argument that the
jury found only $1.3 million in damages.

Accordingly, because CSS waived its objections on this
point and in deference to the jury's judgment, the Court finds
that there was no "manifest injustice" that would warrant a
remittitur or the alteration or amendment of the judgment due to
potentially duplicative claims.  Therefore, CSS' motion to
reduce the damage award on this basis is DENIED.

2. The Damages Are Not Duplicative

Next, CSS argues that the damages awarded by the jury
to Tyden for each of the three claims are impermissibly
duplicative.  (CSS' Mem. [dkt. no. 343], at 18-19.)  CSS is
correct that a double recovery (or, in this case, potentially a
triple recovery) is impermissible where it can be shown that
multiple awards are based on the same injury or damages.  See
Conway v. Icahn & Co., Inc., 16 F.3d 504, 511 (2d Cir. 1994)
("Where a plaintiff seeks recovery for the same damages under
different legal theories, only a single recovery is allowed.").
Therefore, were the Court to find a duplicative damage award,
even if the claims themselves were not inherently duplicative,
the Court would be required to reduce that award.  However, a
"defendant[] do[es] not demonstrate that a jury's award is
duplicative merely by noting that it allocated the damages under
two different causes of action."  Gentile, 926 F.2d at 154.

36

SPA-66

Instead, "[t]he possibility of non-duplicative awards is enough to sustain the jury verdict." MacDermid Printing Solutions, 2015 WL 251527, at *12 (citation omitted).

Here, there is, at the very least, a possibility of a non-duplicative award. First, the Court specifically instructed the jury not to make a duplicative award:

> If you find [Tyden] has prevailed on more than one claim and has established a certain dollar amount with respect to a particular injury, you may not award multiple compensatory damages for the same injury. That is, compensatory damages are only meant to make a plaintiff whole again, not to allow a plaintiff to recover more than he or she has lost. Of course, if different injuries are attributable to separate claims, then you must award individual compensatory damages for the separate injuries to compensate [Plaintiff] fully.

(Tr. 1066:16-25.)

Additionally, the jury verdict form, upon which a juror handwrote each damage award, stated that the award for each charge must not be "duplicative of any other damages you may already have awarded." (Verdict Form [dkt. no. 339].) Finally, CSS' counsel raised this issue immediately upon hearing the jury's verdict, asking the Court: "Can we just clarify the total damages, just to make sure since the numbers were all the same, to make sure that they're not duplicative of—that they were intended for each count?" (Tr. 1102:24-1103:2.) After the Court asked the jurors to confer as to whether "the total amount of damages to be awarded is the sum of the amounts listed," the

37

SPA-67

foreperson responded affirmatively, and CSS' counsel had no further comments or objections.  (Id. at 1103:19-1104:3.) Accordingly, CSS has not made the necessary showing that such damages were duplicative.

In any event, to the extent that these claims or damages could be found to be duplicative, in light of the jury's clear intent that the amount of damages to be awarded was $3.9 million—intent manifested both by the jury's response to questions and by the body language of the individual jurors—that amount should be awarded on the theft of trade secrets claim and nothing should be awarded on the unjust enrichment and unfair competition claims. Therefore, Defendant's motion to reduce damages is DENIED on this basis.

IV.   CONCLUSION

For the foregoing reasons, the Court DENIES Defendant CSS' motion in its entirety.  The Clerk of Court shall mark as closed the pending motion [dkt. no. 342] and deny as moot any other pending motions.

SO ORDERED.
Dated:    New York, New York
          December 23, 2015

_Loretta A. Preska_
LORETTA A. PRESKA
Chief United States District Judge